IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

_____

**STATE OF ARIZONA**,
*Appellee*,

*v.*

**OSCAR PENA TRUJILLO**,
*Appellant*.

_____

No. CR-18-0531-PR
Filed May 4, 2020

_____

Appeal from the Superior Court in Pima County
The Honorable Howard L. Fell, Judge Pro Tempore
No. CR20152255-001
**AFFIRMED**

Opinion of the Court of Appeals, Division Two
245 Ariz. 414 (App. 2018)
**VACATED**

_____

COUNSEL:

Mark Brnovich, Arizona Attorney General, O.H. Skinner, Solicitor General, Joseph T. Maziarz, Chief Counsel, Criminal Appeals Section, Amy Pignatella Cain (argued), Assistant Attorney General, Tucson, Attorneys for State of Arizona

Joel Feinman, Pima County Public Defender, David J. Euchner (argued), Michael J. Miller, Deputy Public Defenders, Tucson, Attorneys for Oscar Pena Trujillo

Daniel C. Barr, Randal B. McDonald, Lindsey M. Huang, Perkins Coie, LLP, Phoenix, and Martin Lieberman, Jared G. Keenan, American Civil Liberties Union Foundation of Arizona, Phoenix, Attorneys for Amicus Curiae American Civil Liberties Union of Arizona

―――――――――

JUSTICE GOULD authored the opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, and JUSTICES LOPEZ, BEENE, and MONTGOMERY joined. JUSTICE BOLICK dissented.

―――――――――

JUSTICE GOULD, opinion of the Court:

¶1        We hold that a judge has the authority, for the purposes of imposing mandatory sex offender registration under A.R.S. § 13-3821(A)(3), to make the necessary factual finding that the victim is under eighteen. In reaching this holding, we conclude that Arizona's sex offender registration statutes are civil regulatory statutes, not criminal penalties. As a result, *Apprendi v. New Jersey*, 530 U.S. 466 (2000) does not apply.

¶2        These laws, which include registration as a sex offender, community notification, and public access to an offender internet registry, serve the important civil regulatory purpose of making offender information "accessible" to the public so that they "can take the precautions they deem necessary" for their own safety. *Smith v. Doe*, 538 U.S. 84, 101, 102–03 (2003). In contrast, the rule of *Apprendi*, which is premised on the Sixth Amendment right to a jury trial in a criminal case, only applies to criminal penalties.

**I.**

¶3        In April 2015, M.A.C., a fifteen-year-old from Honduras, crossed the border into the United States at McAllen, Texas. Immigration officials eventually transferred him to a shelter for immigrant children in Tucson.

¶4        Trujillo was employed as a youth care worker at the Tucson shelter. One morning, while M.A.C. was staying at the shelter, Trujillo entered his room and touched M.A.C.'s penis over his clothing. Trujillo was subsequently convicted of one count of sexual abuse, a class five felony, in violation of A.R.S. § 13-1404(A).

¶5        In reaching its verdict, the jury determined, as an element of the offense, that M.A.C. was "fifteen or more years of age." *See* § 13-1404(A) (defining sexual abuse as "intentionally or knowingly engaging in sexual contact with any person who is fifteen or more years of age without consent"). It made no other findings about M.A.C.'s age.

**¶6** At sentencing, the trial court ordered Trujillo to register as a sex offender pursuant to § 13-3821(A)(3). Under that statute, a defendant convicted of sexual abuse must register as a sex offender "if the victim is under eighteen years of age." *Id.* Trujillo objected, arguing that pursuant to *Apprendi*, a jury was required to find whether M.A.C. was under eighteen. The trial court denied Trujillo's objection.

**¶7** The court of appeals affirmed, holding that *Apprendi* does not apply to § 13-3821(A)(3) because sex offender registration is a civil regulatory requirement, not a criminal penalty. *State v. Trujillo*, 245 Ariz. 414, 421 ¶ 19 (App. 2018). We granted review because this case involves constitutional and statutory issues of statewide importance.

## II.

**¶8** Trujillo asserts that *Apprendi* required the jury to determine whether M.A.C. was under eighteen because this fact increased the range of his punishment from the possibility of no registration under § 13-3821(C) to mandatory registration under § 13-3821(A)(3). As a result, he claims that the judge had no authority to determine the victim's age, and that in doing so, the court violated his right to a jury trial guaranteed by the Sixth Amendment to the United States Constitution, and article 2, section 24 of the Arizona Constitution.[1]

**¶9** We review constitutional questions and questions of law de novo. *State v. Moody*, 208 Ariz. 424, 445 ¶ 62 (2004).

### A.

**¶10** Arizona's sex offender registration requirements are contained in §§ 13-3821 through -3829. Registration is triggered by a conviction for certain specified crimes, as well as crimes where there has been a "finding of sexual motivation pursuant to § 13-118." *See* § 13-3821(A), (C). Convictions for some crimes mandate registration, while others allow for discretion in ordering registration. *See* § 13-3821(A)(1)–(22)

---

[1] Although Trujillo references article 2, section 23 of the Arizona Constitution in his briefing, he fails to develop any argument based on this constitutional provision. As a result, we do not address it. *See State v. Jean*, 243 Ariz. 331, 342 ¶ 39 (2018) (stating that a party does not preserve a state constitutional claim by "[m]erely referring to the Arizona Constitution" in its brief).

(mandatory registration offenses); -3821(C) (discretionary registration offenses).

**¶11** Sex offender registration is, with some exceptions, a life-long requirement. *See Fushek v. State*, 218 Ariz. 285, 291 ¶ 23 (2008); *Fisher v. Kaufman*, 201 Ariz. 500, 502–03 ¶¶ 8–13 (App. 2001); *infra* ¶ 59 (listing exceptions to lifetime requirement). When a person registers, he or she must provide the local county sheriff with his or her name and any aliases, address/physical location, fingerprints, photograph, "online identifier" (such as email address, instant message, or other internet communication name), and the name of any website or internet communication service where he or she is using the identifier. § 13-3821(I), (J), (S)(2). An offender must also advise the sheriff of any postsecondary institution where he or she is a student or an employee. § 13-3821(N). If an offender's information changes, he must provide the sheriff with updated information within seventy-two hours. §§ 13-3822(A); -3821(N) (requiring updates and changes in enrollment or employment status at a postsecondary institution). Violating a registration requirement is punishable as a class four felony. § 13-3824(A); *see also* § 13-3824(B) (stating that violations regarding registration requirements for an online identifier or identification/driver's license are punishable as a class six felony).

**¶12** In 1995, Arizona added a community notification requirement for certain high-risk offenders. *Ariz. Dep't of Pub. Safety v. Superior Court* (*Falcone*), 190 Ariz. 490, 493 & n.3 (1997). Under the community notification provisions, law enforcement is required to disseminate "the offender's photograph and exact address and a summary of the offender's status and criminal background" to the offender's neighbors, "area schools, appropriate community groups and prospective employers." § 13-3825(C)(1). Further, "[a] press release and the notification containing all required offender information must be given to the local electronic and print media to enable information to be placed in a local publication." *Id.*

**¶13** Community notification does not apply to Level One (low-risk) Offenders (§ 13-3825(C)(2)), but is required for Level Two and Three (high-risk) Offenders (§ 13-3825(C)(1)). The agency having "custody or responsibility for supervision of an offender" is tasked with performing a risk assessment to determine an offender's risk level. § 13-3825(M).

**¶14** Finally, the Department of Public Safety must "maintain an internet sex offender website for the purpose of providing sex offender information to the public." § 13-3827(A). The registry contains the offender's name, address, age, current photograph, offense committed, risk assessment/notification level, and a copy of the offender's nonoperating identification license or driver's license. § 13-3827(B), (F).

**¶15** The public does not have access to registry information for Level One Offenders. § 13-3823; -3825(C)(2). However, the public may access information about Level Two and Three Offenders, as well as offenders convicted of certain completed offenses. § 13-3827(A)(1)–(2) (listing offenses requiring public access to internet registry).

B.

**¶16** In *Apprendi*, the United States Supreme Court held that a jury must determine any fact, apart from a prior conviction, that increases a defendant's prison sentence above the statutory maximum sentence. 530 U.S. at 476 (quoting *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999)). The Supreme Court has subsequently expanded the scope of *Apprendi* to encompass any fact that increases the minimum or maximum range of a prison sentence or a criminal penalty. *See United States v. Haymond*, 139 S. Ct. 2369, 2378–79, 2382 (2019) (applying *Apprendi* to a statute increasing the maximum range of a defendant's original prison sentence based on a determination that the defendant violated his supervised release); *Alleyne v. United States*, 570 U.S. 99, 103 (2013) (applying *Apprendi* to "any fact that increases the mandatory minimum" prison sentence); *S. Union Co. v. United States*, 567 U.S. 343, 348, 350, 360 (2012) (applying *Apprendi* to facts necessary to increase the amount of a criminal fine); *see also State v. Brown*, 209 Ariz. 200, 203 ¶ 12 (2004) (holding that *Apprendi* applies to aggravating factors necessary to increase the range of prison sentence above the statutory "presumptive" prison sentence).

**¶17** *Apprendi* is based on a defendant's Sixth Amendment right to a jury trial in a criminal case. 530 U.S. at 476; *id.* at 500, 518 (Thomas, J., concurring); *see also Blakely v. Washington*, 542 U.S. 296, 298, 305, 308–09 (2004); *S. Union*, 567 U.S. at 346 (stating that *Apprendi* is based on the "[t]he Sixth Amendment"); *c.f.* U.S. Const. amend. VI (stating that, "In all criminal prosecutions, the accused shall" have the right to a jury trial); Ariz. Const. art. 2, § 24 (same). Thus, in "consider[ing] the scope of the Sixth Amendment right of jury trial," courts only apply "the rule of *Apprendi*" to "factfinding that increases [] *criminal* sentences, penalties, or punishments."

*S. Union*, 567 U.S. at 348, 350, 352 (emphasis added) (internal quotation marks omitted); *see also United States v. Ward*, 448 U.S. 242, 248 (1980) (stating that "the protections provided by the Sixth Amendment are available only in criminal prosecutions" (internal quotation marks omitted)).

¶18　　　In contrast, *Apprendi* does not apply to civil regulatory consequences accompanying a criminal conviction. For example, in *Young v. State*, 806 A.2d 233, 235, 250 (Md. 2002), the court held that *Apprendi* did not prohibit the trial judge from determining that the victim was under eighteen, a factual finding necessary to impose sex offender regulations, because Maryland's sex offender registration statutes were civil regulatory requirements. Similarly, in *Wiggins v. State*, 702 S.E.2d 865, 866, 868 (Ga. 2010), the court held that the trial judge did not violate *Apprendi* by determining the victim was a "minor," a required predicate finding for imposing sex offender registration, because the "sex offender registry requirement is regulatory and not punitive in nature." *See also People v. Mosley*, 344 P.3d 788, 792, 798 (Cal. 2015) (same); *State v. Hachmeister*, 395 P.3d 833, 835, 839–40 (Kan. 2017) (same); *People v. Golba*, 729 N.W.2d 916, 924–25, 927 (Mich. Ct. App. 2007) (same).

### III.

¶19　　　Thus, whether *Apprendi* applies in this case depends on whether Arizona's sex offender registration laws are civil regulatory requirements or criminal penalties. In determining whether a statute is civil or criminal, courts generally apply the "intent/effects test." *See, e.g.*, *Smith*, 538 U.S. at 92 (applying the intent/effects test to determine whether Alaska's sex offender registration statutes were civil or criminal); *State v. Noble*, 171 Ariz. 171, 175 (1992) (stating this court looks first to the intent/effects test to determine whether "the registration requirement is punitive or regulatory").

¶20　　　Under the intent/effects test, "[i]f the intention of the legislature was to impose [a criminal] punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive," a court "must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate [the legislature's] intention to deem it civil." *Smith*, 538 U.S. at 92 (internal citation omitted) (internal quotation marks omitted).

¶21        Applying the intent/effects test in *Noble*, we determined that sex offender registration was a civil regulatory requirement. 171 Ariz. at 178. Trujillo contends, however, that under the version of the statute in effect when *Noble* was decided, the "potentially punitive aspects of the statute [were] mitigated" because "outside of a few regulatory exceptions, the information provided by sex offenders" was "kept confidential." *Id.* After *Noble* was decided, the legislature removed the confidentiality provision by enacting the community notification and internet registry provisions. Thus, according to Trujillo, the current registration statutes are now criminal penalties.

¶22        At oral argument, defense counsel stated Trujillo is registered as a Level One Sex Offender. If true, Trujillo is only required to register as a sex offender; he is not subject to the community notification and internet registry provisions. *See supra* ¶¶ 13–15. And, because *Noble* held that essentially the same registration statute was civil, that decision resolves whether *Apprendi* applies to this case.

¶23        Apart from counsel's brief reference at oral argument to Trujillo's sex offender level, the record is silent on this issue. Neither party has cited any evidence or addressed Trujillo's registration level in their briefs, and we therefore decline to speculate whether Trujillo is registered as a Level One, Two, or Three Sex Offender. Rather, because the parties have fully briefed and presented the issue as if Trujillo *is* subject to the community supervision and internet registry statutes, we will address whether these provisions are civil regulatory requirements or criminal penalties.

¶24        We further note that the parties have limited their briefing to the registration, community notification, and internet registry provisions contained in §§ 13-3821 through -3827. The parties have not raised, and therefore we do not address, the sex offender residency restrictions contained in § 13-3727.

A.

¶25        Legislative intent is the most important factor in determining whether a statute is a civil regulatory requirement or a criminal penalty. When "ascertain[ing] whether the legislature meant the statute to establish 'civil' proceedings," courts "ordinarily defer to the legislature's stated intent." *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997); *see also Falcone*, 190 Ariz. at 494–95 (stating that in determining "whether the community-

notification statute is punitive . . . [t]he intent of the legislature is singularly important although not the sole determinant"). In deferring to legislative intent, we recognize that under the constitutional principle of separation of powers, the legislature, not the judiciary, has the authority to prescribe punishments for crimes. *See United States v. Wiltberger*, 18 U.S. 76, 95 (1820) ("[T]he power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment."); *see also Dowling v. United States*, 473 U.S. 207, 213 (1985) (stating that courts should exercise restraint and "[d]ue respect for the prerogatives of Congress in defining federal crimes"); *Fitzgerald v. Myers*, 243 Ariz. 84, 90 ¶ 15 (2017) (holding that the legislature has the authority to define crimes).

**¶26** Here, to determine legislative intent, we examine the text and structure of Arizona's sex offender registration statutes. *See Smith*, 538 U.S. at 92; *Hendricks*, 521 U.S. at 361. In *Noble*, this Court stated that the registration requirement was structured to serve the nonpunitive goal of "facilitating the location of child sex offenders by law enforcement personnel, a purpose unrelated to punishing [offenders] for past offenses." 171 Ariz. at 178; *see also Falcone*, 190 Ariz. at 495 (same); *In re Maricopa Cty. Juv. Action No. JV-132744*, 188 Ariz. 180, 183 (App. 1996) (same). Thus, *Noble* concluded, the legislature's intent in enacting the registration statute was to create a civil regulatory provision. *Noble*, 171 Ariz. at 178.

**¶27** We agree with *Noble*'s conclusion that Arizona's registration statutes provide law enforcement with "a valuable tool" in locating sex offenders by giving them "a current record of the identity and location of" such offenders. 171 Ariz. at 177 (quoting *Atteberry v. State*, 438 P.2d 789, 791 (1968)). The community notification and internet registry provisions also advance this purpose by making offender information "accessible" to the public so they "can take the precautions they deem necessary" for their own safety. *Smith*, 538 U.S. at 101, 102–03.

**¶28** Additionally, when the legislature enacted the community notification provision in 1996, it expressly stated its intent to create a civil regulatory scheme. Specifically, the legislature found

> that some sex offenders pose a high risk of engaging in sex
> offenses after being released from imprisonment or
> commitment and that protecting the public from sex
> offenders is a paramount governmental interest. . . . The
> release of information about sexual predators to public

agencies and, under limited circumstances, to the public will
further the government's interests of public safety . . . .

Act of May 1, 1996, 1996 Ariz. Sess. Laws ch. 315, § 20, 1682–83 (2nd Reg.
Sess.). These express findings by the legislature "evince[] a regulatory
objective to forestall future incidents of sexual abuse by notifying those who
may well encounter a potential recidivist, not to punish a past offense."
*Falcone*, 190 Ariz. at 495; *see also Smith*, 538 U.S. at 96 (noting that the
legislature's express findings in support of its sex offender registration act
demonstrated "the intent of the Alaska Legislature was to create a civil,
nonpunitive regime").

**¶29** We recognize, however, that codification of the registration
statutes in Title 13, the Arizona Criminal Code, arguably evinces a
legislative intent to classify these statutes as criminal. *See Smith*, 538 U.S. at
94–95; *Hendricks*, 521 U.S. at 361. This fact, however, is not determinative.
For example, in *Smith*, the legislature placed the sex offender registration
provisions (as opposed to the notification provisions) in the criminal code.
538 U.S. at 95. Despite this fact, the Court determined that the legislature
intended to enact a civil scheme because the criminal code "contains many
provisions that do not involve criminal punishment," and that "[a]lthough
some of these provisions relate to criminal administration, they are not in
themselves punitive." *Id.*; *see also United States v. One Assortment of 89
Firearms,* 465 U.S. 354, 364 (1984) (stating that despite placement of
forfeiture provisions in the criminal code, Congress intended those
provisions to be civil).

**¶30** We conclude that, despite placement of the registration
statutes in the criminal code, the legislature intended to create a civil
regulatory scheme. *See State v. Henry*, 224 Ariz. 164, 171 ¶ 22 (App. 2010)
(noting that Arizona's sex offender registration system is "regulatory
despite its codification in title 13, A.R.S., our criminal code"). As in *Smith*,
Arizona's criminal code contains both civil regulatory provisions and
criminal statutes. *See, e.g.*, §§ 13-4301 to -4315 (civil forfeiture).
Additionally, we agree with *Noble*'s conclusion that the structure of the
registration scheme is regulatory, not punitive. Finally, we place great
weight on the legislature's expression of a civil regulatory purpose in
enacting the 1996 community supervision laws.

**¶31** Finally, we note that while registration violations may be
prosecuted as separate crimes, this does not make Arizona's registration
scheme punitive. In *Noble*, we held that sex offender registration was civil

despite the fact it was enforced solely through criminal prosecution and registration violations were designated as felony offenses. 171 Ariz. at 178. Likewise, in *Smith*, the Supreme Court determined that the legislature intended to create a civil scheme despite the fact offenders who failed to comply with the act were "subject to criminal prosecution." 538 U.S. at 90.

¶32 Accordingly, we conclude that the legislature's purpose in enacting Arizona's sex offender registration statutes was to create a civil regulatory scheme.

### B.

¶33 Based on the legislature's intent to create a civil regulatory scheme, Trujillo faces a "heavy burden" in seeking to reclassify the registration statutes as punitive. *Hendricks*, 521 U.S. at 361. To satisfy this burden, Trujillo must provide "the clearest proof" that the registration scheme is "so punitive either in purpose or effect" that it negates the legislature's intent to classify these statutes as "civil." *Id.* (quoting *United States v. Ward*, 448 U.S. 242, 248–49 (1980)); *see also Falcone*, 190 Ariz. at 496 (same).

¶34 To determine the effects of Arizona's registration statute, we apply the same factors used in *Smith* to analyze the effects of Alaska's registration scheme. These factors examine whether the registration statutes: (1) have been historically regarded as punishment; (2) impose an affirmative restraint or disability; (3) promote the traditional goals of punishment; (4) have a "rational connection to a nonpunitive purpose"; and (5) are excessive with respect to their nonpunitive purpose. *Smith*, 538 U.S. at 97.

### 1. Historically Regarded as Punishment

¶35 In *Smith*, the Supreme Court concluded that sex offender registration laws have not been historically regarded as punishment. *Id.* The Court noted that "sex offender registration and notification statutes are of fairly recent origin," suggesting they do "not involve a traditional means of punishing." *Id.* (citation omitted) (internal quotation marks omitted). The Court also stated that, although registering as a sex offender "may cause adverse consequences for the convicted defendant, running from mild personal embarrassment to social ostracism[,] [i]n contrast to the colonial shaming punishments, . . . the State does not make the publicity and the resulting stigma an integral part of the objective of the regulatory scheme." *Id.* at 99. To the contrary, the Court observed that any stigma

caused by registering as a sex offender "results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record." *Id.* at 98. Further, the Court stated that most of the registration information "is already public," and that our system of criminal justice, including "public indictment, public trial, and public imposition of sentence," necessarily entails public dissemination of truthful information about criminal defendants. *Id.* at 98–99.

¶36 *Smith* also concluded that "[t]he fact that Alaska posts the information on the Internet does not alter our conclusion." *Id.* at 99. The Court noted that under Alaska's system, although the registration statutes did not specify how an offender's information was to be made available to the public, the state chose "to make most of the nonconfidential information available on the Internet." *Id.* at 91. Thus, the public was allowed access to a wide variety of information, including the offender's "name, aliases, address, photograph, physical description . . . license [and] identification numbers of motor vehicles, place of employment, date of birth, crime for which convicted, date of conviction, place and court of conviction, length and conditions of sentence, and a statement as to whether the offender . . . is in compliance with [the update] requirements . . . or cannot be located." *Id.* (quoting Alaska Stat. § 18.65.087(b) (2000)).

¶37 Analyzing the effect of public access to this information on the internet, *Smith* acknowledged that "the geographic reach of the Internet is greater than anything which could have been designed in colonial times." *Id.* at 99. However, it reasoned that "[t]hese facts do not render Internet notification punitive," because "[t]he purpose and the principal effect of notification are to inform the public for its own safety, not to humiliate the offender." *Id.* Thus, the Court concluded, "[w]idespread public access is necessary for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation." *Id.*

¶38 We recognize that in *Noble*, in contrast to *Smith*, we determined that sex offender registration laws have been traditionally viewed as criminal punishment. *Noble*, 171 Ariz. at 176–77. *But see Henry*, 224 Ariz. at 170 ¶ 20 ("[W]e regard *Noble*'s finding that registration has been traditionally viewed as a form of punishment . . . as having been undermined by *Smith*."). Nonetheless, we agree with *Smith* and disapprove *Noble's* conclusion on this point. Sex offender registration, including community notification and public access to the internet registry, is of recent origin, and serves the purpose of disseminating truthful information to the public for its own safety. Moreover, much of the information

disseminated and contained in the registry is already public. For example, an offender's criminal conviction is a public record. *State v. King*, 213 Ariz. 632, 638 ¶ 24 (App. 2006). An offender's conviction and identifying information are available to potential employers and other persons and organizations unaffiliated with law enforcement. *See* A.R.S. § 41-1750(A), (G); *Falcone*, 190 Ariz. at 496 ("In defined circumstances, potential employers and government agencies not involved in law-enforcement . . . have access to the offender's history," including "not only the nature of the conviction but identifying information."). And, of course, an offender's pretrial proceedings, trial and sentencing are all public proceedings. *See* U.S. Const. amend. VI (right to a public jury trial in a criminal case); Ariz. Const. art. 2, § 11 (guarantee of public access to all court proceedings); *Id.* § 24 (right to a public jury trial); A.R.S. § 13-607(B) (judgment and sentencing must be done in open court for all criminal cases).

**¶39** Accordingly, we conclude that because sex offender registration laws have not been historically regarded as punishment, this factor indicates that the effect of Arizona's registration statutes is regulatory and not punitive.

### 2. Affirmative Disability or Restraint

**¶40** In *Noble*, this Court held that Arizona's registration statutes do not "*affirmatively* inhibit or restrain an offender's movement or activities." *Noble*, 171 Ariz. at 176 (citation omitted) (internal quotation marks omitted). Trujillo argues, however, that based on the community supervision and internet registry provisions that have been added to the registration scheme since *Noble*, the current provisions place an affirmative disability and restraint on offenders. We disagree.

**¶41** In *Smith*, the Supreme Court concluded that Alaska's registration statutes did not place an affirmative disability or restraint on offenders. As an initial matter, the Court noted that the registration provisions placed no physical limitations or mandatory conditions on offenders. *Smith*, 538 U.S. at 100–01. Additionally, the statutes did not require offenders to report to a supervising officer, such as a parole or probation officer. *Id.* at 101. Rather, "offenders . . . are free to move where they wish and to live and work as other citizens," including changing jobs or residences, without the approval of a parole or probation officer. *Id.*

**¶42** In contrast, in *State v. Payan*, 765 N.W.2d 192, 203 (Neb. 2009), the Nebraska Supreme Court concluded that the restraints imposed by

Nebraska's sex offender community supervision statutes imposed a criminal penalty. These provisions included "restrictions on place of residence; required reporting to a parole officer; and submission to medical, psychological, psychiatric, or other treatment." *Id.* In addition, offenders were "subject to drug and alcohol testing, restrictions on employment and leisure activities, and polygraph examinations." *Id.* Thus, the court concluded, the community supervision statutes "involve[] affirmative restraints and disabilities similar to and arguably greater than traditional parole." *Id.*

¶43 Arizona's registration scheme is more analogous to Alaska's scheme than Nebraska's. Like Alaska's registration scheme, offenders are not physically restrained in any manner, nor are their activities restricted. Offenders also have no mandatory conditions, nor do they have to report to a probation or parole officer. Additionally, Arizona's registration provisions place no restrictions on an offender's choice of residence or employment.

¶44 By comparison, Arizona's registration scheme is far less restrictive than the civil commitment scheme addressed by the Supreme Court in *Hendricks*. There, the Court examined Kansas' Sexually Violent Predator Act, which established civil commitment proceedings for any person who had "been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence." 521 U.S. at 350, 352 (quoting Kan. Stat. Ann. § 59-29a02(a) (1994)). Although the maximum period of commitment for any proceeding was one year, if the state sought to continue detention beyond that time, a person could be confined indefinitely. *Id.* at 364.

¶45 Despite the potentially indefinite period of restraint, the Court concluded that the scheme was civil. *Id.* at 368–69. It stated that "[a]lthough the civil commitment scheme at issue here does involve an affirmative restraint, the mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment." *Id.* at 363 (citation omitted) (internal quotation marks omitted). Rather, "[t]he State may take measures to restrict the freedom of the dangerously mentally ill" because this promotes "a legitimate nonpunitive governmental objective." *Id.* The Court further stated that "[i]f detention for the purpose of protecting the community from harm *necessarily* constituted punishment, then all involuntary civil commitments would have to be considered punishment. But we have never so held." *Id.*

¶46    We recognize that public dissemination of an offender's information may have a negative impact on where the offender lives and works, and that the community notification and internet registry provisions increase the number of people who have access to this information. However, as the Supreme Court noted in *Smith*, although public access to registration information "may have a lasting and painful impact on the convicted sex offender, these consequences flow not from the Act's registration and dissemination provisions, *but from the fact of conviction*, already a matter of public record." 538 U.S. at 101 (emphasis added). Likewise, here, the registration provisions do not label the offender "as more culpable than he was before." *Falcone,* 190 Ariz. at 497. Rather, the primary negative impact on offenders, including restrictions on their employment and housing, stems from their convictions, not their registrations. And, as *Smith* observed, because much of the "information about the individual's conviction [is] already in the public domain," this enables "[l]andlords and employers" to "conduct background checks on the criminal records of prospective employees or tenants even with the [registration] Act not in force." 538 U.S. at 100; *see also supra*, ¶ 38 (noting that criminal convictions are public records accessible to employers and other private entities).

¶47    Trujillo argues, however, that Arizona's registration statutes are more restrictive than those addressed in *Smith*. Specifically, he argues that Arizona's statutes require offenders to report and update their information in person with the sheriff's department. In contrast, Alaska's registration statutes allowed offenders to update and verify their information in writing, without having to "report" in person. *Smith*, 538 U.S. at 101.

¶48    We are not persuaded by Trujillo's argument. To be clear, in Arizona, not all changes in offender information must be made in person. For example, changes regarding an offender's online identifier can be made in writing. § 13-3822(C). More importantly, while some information must be provided to the sheriff's department in person, offenders are not required to report to a supervising probation or parole officer. Additionally, requiring offenders to provide their information in person does not limit an offender's daily activities, nor does it entail obtaining approval from the sheriff in choosing where to live or work.

¶49    We also note that the registration requirements in *Smith* were, in some ways, *more* restrictive than Arizona's. Alaska's scheme required offenders to verify their information four times a year, while Arizona's only

requires offenders to verify their information annually. *See Smith*, 538 U.S. at 117 (Ginsburg, J. dissenting); *compare* Alaska Stat. Ann. §§ 12.63.010(d)(2), 12.63.020(a)(1) (requiring sex offenders to verify information quarterly), *with* A.R.S. § 13-3821(J) (requiring sex offenders to verify information annually). Additionally, Alaska's registration scheme required offenders to report their employment and vehicle information. *Smith*, 538 U.S. at 90. Arizona offenders, however, are not required to report this information. *See* § 13-3821(N) (stating only that offenders must report information concerning their employment at a postsecondary educational institution).

¶50            As a result, we conclude that this factor also indicates that the effect of Arizona's registration statutes is regulatory.

### 3.            Promotes Traditional Aims of Criminal Punishment

¶51            In *Smith*, the state conceded that Alaska's registration act might, consistent with the purpose of the criminal justice system, have a deterrent effect on offenders committing future crimes. 538 U.S. at 102. We reached a similar conclusion in *Noble*. 171 Ariz. at 177 (stating that Arizona's registration statutes promote the "traditional deterrent function of punishment, the notion being that a convicted sex offender is less likely to commit a subsequent offense if his whereabouts are easily ascertained by law enforcement officials").

¶52            However, the fact that Arizona's registration statutes have a deterrent effect does not, by itself, transform them into criminal penalties. Deterrence may also serve a civil regulatory goal. *Falcone*, 190 Ariz. at 497. As *Smith* noted, simply because a registration scheme may have a deterrent effect "proves too much" because "[a]ny number of governmental programs might deter crime without imposing punishment." 538 U.S. at 102. Indeed, as *Smith* observed, if the "mere presence of a deterrent purpose" transforms civil regulatory requirements into criminal penalties, then the "[g]overnment's ability to engage in effective regulation" would be severely undermined. *Id.* (citation omitted) (internal quotation marks omitted).

¶53            As a result, although this factor indicates that Arizona's registration laws may have a punitive effect, it "does not compel the conclusion that the [scheme] is impermissibly punitive." *Falcone*, 190 Ariz. at 497; *see also Smith*, 538 U.S. at 94 ("[E]ven if the objective of the [registration] Act is consistent with the purposes of the Alaska criminal

justice system, the State's pursuit of it in a regulatory scheme does not make the objective punitive.").

**¶54**      Trujillo also argues that because offenders may suffer stigma from the public dissemination of their information, Arizona's registration statutes are retributive, and therefore punitive. We disagree. Stigma and shame are not unique to criminal punishment; civil remedial sanctions may also harm a person's reputation. *Falcone*, 190 Ariz. at 497. And, as we conclude below, *see infra* ¶ 55, the primary effect of these laws is not to punish, but to advance the important regulatory purpose of disseminating truthful information to the public for its own safety. *See Smith*, 538 U.S. at 98 ("Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment.").

### 4.      Rational Connection to a Nonpunitive Purpose

**¶55**      Arizona's registration scheme is rationally connected to the civil regulatory purpose of protecting the community from potentially dangerous sex offenders. *See id.* at 93 (stating that protecting the community by employing restrictive measures against sex offenders deemed dangerous to the community is a legitimate civil, regulatory purpose); *see also Hendricks*, 521 U.S. at 363 (stating that imposing restrictive measures on sex offenders determined to be dangerous to the community is "a legitimate nonpunitive governmental objective and has been historically so regarded"). Specifically, Arizona's registration statutes provide law enforcement with "a valuable tool" in locating sex offenders by giving them "a current record of the identity and location of" such offenders. *Noble*, 171 Ariz. at 177 (citation omitted) (internal quotation marks omitted). Additionally, the community notification and internet registry provisions make offender information "accessible" to the public so that they "can take the precautions they deem necessary" for their own safety. *Smith*, 538 U.S. at 101, 102–03.

### 5.      Excessive in Relation to Regulatory Purpose

**¶56**      In determining whether a civil scheme is excessive in relation to its regulatory purpose, we note that "[a] statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Id.* at 103. Rather, "[t]he excessiveness inquiry . . . is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether

the regulatory means chosen are reasonable in light of the nonpunitive objective." *Id.* at 105.

¶57	Arizona's registration scheme is reasonably related to its regulatory purpose because "our legislature has taken steps to tailor the statutes to serve more precisely" its civil regulatory purpose. *Henry*, 224 Ariz. at 171 ¶ 23. Specifically, Arizona's registration requirements are limited to offenders who are convicted of serious sex offenses involving sexual assault, minor victims, and repetitive sex offenders. *See* § 13-3821(A)(1)–(22); *see also Smith*, 538 U.S. at 103–04 ("Alaska could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism," and, as a result, "[t]he State's determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment."); *Hendricks*, 521 U.S. at 368–69 (holding that involuntary commitment for sexually violent offenders was regulatory, and not punitive, where the State, among other things, "disavowed any punitive intent" and "limited confinement to a small segment of particularly dangerous individuals" (internal quotation marks omitted)).

¶58	Additionally, Arizona's community notification provisions only apply to offenders who, based on a risk assessment, have been identified as high-risk, Level Two and Level Three Offenders. § 13-3825(C)(1)–(2); *see also Falcone*, 190 Ariz. at 499 (holding that the community notification provisions were not excessive because "the community-notification statute is sensitive concerning the varying degrees of risk presented by different offenders by tailoring the dissemination of information to the jeopardy posed"). Similarly, public access to the internet registry is limited to information about offenders who have been assessed as Level Two and Three Offenders, as well as offenders convicted of a small number of serious sex offenses. § 13-3827(A)(1)–(2); *see also Henry*, 224 Ariz. at 171 ¶ 23 (stating that to serve the "nonpunitive ends" of the registration statutes, the legislature has limited "mandatory community and website notification" to those "offenders deemed to pose a heightened risk to the community").

¶59	The legislature has taken other steps to tailor Arizona's registration scheme to its civil regulatory purpose. For instance, registration terminates for juvenile offenders when they turn twenty-five. § 13-3821(F); *see also* § 13-3821(G) (duty to register may be terminated upon successful completion of probation for a person convicted of an offense when they were under eighteen years of age). Similarly, a defendant who

was under twenty-two at the time they committed certain specified offenses may petition to terminate registration. § 13-3821(H); § -3826(A); § -923.

**¶60** Finally, Arizona's lifetime registration requirement does not "affix culpability for prior criminal conduct," but is based on assessing the future dangerousness of an offender for the purpose of protecting the community. *See Hendricks*, 521 U.S. at 362; *Falcone*, 190 Ariz. at 497 (stating that under Arizona's registration statutes, the "offender is not labeled as more culpable than he was before"). Thus, Arizona's lifetime registration requirement, like the life-long requirement addressed in *Smith*, is "reasonably related to the danger of recidivism," and therefore "is consistent with the regulatory objective" of regulating the offender's future conduct. *See Smith*, 538 U.S. at 90, 98, 102.

**¶61** In short, we agree with *Smith*'s conclusion that, "[g]iven the general mobility of our population, for Alaska to make its registry system available and easily accessible throughout the State was not so excessive a regulatory requirement as to become a punishment." *Id.* at 105. The same reasoning applies here. *See id.* at 90–91, 104–06.

**¶62** Trujillo argues, however, that *Smith* is distinguishable from this case because it involved a passive notification system requiring individuals to "seek access to the information," where, in contrast, Arizona's notification provision requires law enforcement to affirmatively disseminate offender information to the public. *See id.* at 105. Thus, he claims that Arizona's active dissemination of offender information renders our registration scheme punitive.

**¶63** We disagree. As noted in *Smith*, "[w]idespread public access is necessary for the efficacy" of a registration scheme. *Id.* at 99. Here, the affirmative efforts of law enforcement to disseminate truthful information about high-risk offenders are a reasonable, effective means of promoting the registration scheme's civil regulatory purpose.

**¶64** Weighing the above factors, we conclude that the effects of Arizona's sex offender registration statutes do not negate the legislature's intent to create a civil regulatory scheme. Our conclusion is buttressed by the fact that *Smith*, which examined a registration scheme similar to Arizona's, concluded that "the Act's effects leads to the determination that respondents cannot show, much less by the clearest proof, that the effects of the law negate Alaska's intention to establish a civil regulatory scheme." *Id.* at 91, 105.

**IV.**

**¶65**        Trujillo and our dissenting colleague assert that in determining whether *Apprendi* applies in this case, we should use the "serious offense" framework set forth in *Blanton v. City of N. Las Vegas, Nev.*, 489 U.S. 538 (1989), rather than the intent/effects test.  To support their argument, Trujillo and the dissent employ a novel construction of *Southern Union*, *Blanton*, and *Fushek*.  First, they claim that *Blanton* requires a jury trial for a "severe" or "serious penalty."  Second, they construe *Fushek* as holding that because sex offender registration is a "serious/severe penalty," *Apprendi* requires every fact making a person eligible for registration to be submitted to a jury.  Third, they contend that *Southern Union* expanded the scope of *Apprendi* to encompass all "serious/severe penalties," including sex offender registration.  However, none of these cases supports their position.

**¶66**        In *Blanton*, the Supreme Court held that the Sixth Amendment's jury trial guarantee applies to "serious" offenses, but not "petty offenses."  489 U.S. at 543–44.  Under *Blanton's* framework, an offense is presumed to be serious, therefore entitling the defendant to a jury trial, "whenever the offense . . . carries a maximum . . . prison term of greater than six months."  *Id.* at 542.  Conversely, an offense is presumed to be "petty," and therefore no right to a jury trial arises, if it carries a jail term of less than six months.  *Id.* at 543.

**¶67**        *Blanton* further held that a petty offense carrying a jail term of less than six months may be classified as a serious offense if, in addition to the maximum jail term, there are "additional statutory penalties" that "are so severe . . . they clearly reflect a legislative determination" to classify the offense as serious.  *Id.*  These "additional statutory penalties" include both the civil regulatory requirements and criminal penalties that accompany a conviction.  *Id.* at 544–45 & n.9 (considering both civil and criminal "penalties" in determining whether the underlying offense was "serious"); *see also Bado v. United States*, 186 A.3d 1243, 1252, 1254 (D.C. 2018) (rejecting the government's argument that because "removal" was a "civil sanction," it "should not be considered in a *Blanton* analysis"); *Derendal v. Griffith*, 209 Ariz. 416, 425–26 ¶ 40 & n.9 (2005) (considering civil consequence of loss of a driver's license in determining whether underlying offense was serious); *Buccellato v. Morgan*, 220 Ariz. 120, 125 ¶ 13 n.5 (App. 2008) (stating that a court must consider civil administrative consequences accompanying a criminal conviction, such as revocation of a business permit, in determining whether an offense is serious).

¶68        *Blanton* does not, as Trujillo and the dissent contend, require a jury trial for "serious/severe penalties."  To the contrary, *Blanton* only addresses the right to a jury trial for an underlying offense; it says nothing about whether a defendant has the right to a jury to determine facts triggering a civil regulatory requirement or a criminal penalty.

¶69        *Blanton* also does not provide a useful framework for this case.  The issue before us is whether, for the purpose of applying *Apprendi*, Arizona's registration statutes are civil or criminal.  *Blanton* provides no assistance in resolving this issue because *Blanton* focuses "on an array of penalties without pausing to determine whether they are punitive or regulatory."  *See Blanton*, 489 U.S. at 543, 544–45 & n.9; *Bado*, 186 A.3d at 1252–53 (stating that *Blanton* "did not parse whether the [additional] penalties were penal or civil in nature and took care to consider the relative burdens imposed by each of several penalties that were civil in nature." (internal quotation marks omitted)).

¶70        Trujillo and the dissent also misconstrue *Fushek*.  In *Fushek*, the defendant was charged with several misdemeanor offenses carrying jail terms of 30 to 180 days.  218 Ariz. at 287–89 ¶¶ 2–3, 10 & n.4.  The state alleged that the offenses were sexually motivated pursuant to § 13-118.  *Id.* at 287 ¶ 2.  Based on that allegation, the defendant was eligible, at the discretion of the court, for lifetime sex offender registration.  *Id.*; *see also* § 13-3821(C).

¶71        Because each offense was "a misdemeanor and punishable by no more than six months incarceration," the charges were "presumptively not jury-trial eligible."  *Fushek*, 218 Ariz. at 288–89 ¶ 10 (citation and internal quotation marks omitted).  However, applying *Blanton's* framework, the court examined whether this presumption was rebutted, because, in addition to a jail term, the defendant was required to register as a sex offender for life.  *Id.* at 289–90 ¶¶ 11, 17.  Ultimately, the court concluded that the maximum jail term, in combination with the "grave consequence" of lifetime registration, was a "rare situation" reflecting the legislature's determination that the offense was a serious offense.  *Id.* at 290–91 ¶¶ 17, 22 (citations omitted) (internal quotation marks omitted).

¶72        Trujillo asserts that *Fushek* "explicitly held that the fact that makes a person eligible for sex offender registration must be tried to a jury."  *Fushek* did no such thing.  *Fushek* held that because the underlying *offenses* were serious, the defendant was entitled to a jury trial on those offenses.  However, *Fushek* neither addressed nor decided whether sexual motivation

(the factual determination triggering registration eligibility) must be tried to a jury. Indeed, that issue was not before the court because § 13-118(B), by its terms, requires sexual motivation to be submitted to the jury. *Id.* at 287, 292 ¶¶ 2, 28.

**¶73** Our dissenting colleague and Trujillo also claim that in *Fushek*, we "rejected" the intent/effects test, and held that *Blanton* provides the proper framework for resolving whether the right to a jury is "implicated." *See Infra* ¶ 92. This statement proves too much. *Fushek* applied *Blanton* because the defendant's right to a jury trial was contingent on whether the underlying offenses were serious or petty. 218 Ariz. at 290–91 ¶¶ 19, 22. In that context, the intent/effects test was not relevant. *Id.* In contrast, *Blanton* is not relevant here because it is undisputed that the offense of sexual abuse (a felony) requires a jury trial. Conversely, the intent/effects test is the proper test to apply in this case because determining whether *Apprendi* applies depends on whether sex offender registration is regulatory or punitive.

**¶74** Finally, Trujillo claims that *Fushek* "implicitly" determined that registration was a criminal punishment. *Fushek* expressly *does not* reach this issue. *See id.* at 290 ¶ 19 ("The issue before us is not whether sex offender registration is criminal punishment for ex post facto purposes . . .").

**¶75** Trujillo and the dissent's reliance on *Southern Union* is also misplaced. In *Southern Union*, the defendant, a corporation, was indicted for storing mercury without a permit in violation of 42 U.S.C. § 6928(d)(2)(A). 567 U.S at 346. That statute, codified under a heading entitled "criminal penalties," imposed a criminal fine of $50,000/day for each violation, as well as up to five years in prison. 42 U.S.C. § 6928(d)(7); 567 U.S. at 347. The jury returned a guilty verdict and, based on the government's allegation that the defendant illegally stored the mercury for 762 days, the court calculated the amount of the fine to be $38.1 million (762 days x $50,000/day). 567 U.S. at 347. The defendant challenged the court's authority to calculate the fine, arguing that pursuant to *Apprendi*, the amount of the fine was a jury question. *Id.* The Supreme Court agreed, concluding that criminal fines are subject to *Apprendi*. *Id.* at 350, 360.

**¶76** *Southern Union* did not, as Trujillo contends, "unify" *Blanton* and *Apprendi*. In fact, *Southern Union* did not apply *Blanton's* framework at all. There was no need to do so, given the fact the underlying charge was a felony, making the jury trial requirement uncontested. *See S. Union* 567 U.S.

at 352. Far from "unifying" *Apprendi* and *Blanton*, the Court expressly stated that *Blanton* and *Apprendi* address two *different* questions, and that seeking to apply *Blanton's* framework to *Apprendi*, "asks the wrong question." *Id.* at 351–52.

¶77 Additionally, like *Blanton, Southern Union* does not provide any useful guidance in resolving whether *Apprendi* applies here. Specifically, the application of *Apprendi* turns on whether the registration is civil or criminal. But that was not an issue in *Southern Union*, because it was undisputed that the subject fines were criminal penalties. *Id.* at 350 (stating that defendant's fines "undeniably" constitute "criminal sentence[s], penalties, [and] punishment[s]" (internal quotation marks omitted)); *see also State v. Far W. Water & Sewer Inc.*, 224 Ariz. 173, 201 ¶ 111 n.14 (App. 2010) (stating that in Arizona, it is well-established that a fine is a criminal penalty); *State v. Pitts*, 26 Ariz. App. 390, 391 (1976) (same).

¶78 Finally, Trujillo and the dissent argue that the intent/effects test does not apply in the context of the Sixth Amendment. This assertion is apparently based on *Smith* and *Noble*, where the courts applied the test to determine whether retroactive application of registration laws violated the constitutional bar on ex post facto laws. *See Smith*, 538 U.S. at 91; *Noble*, 171 Ariz. at 173–74. Because the prohibition against ex post facto laws only applies to criminal laws, *Smith* and *Noble* used the intent/effects test to determine whether the subject registration laws were civil or criminal. *See Galvan v. Press*, 347 U.S. 522, 531 & n.4 (1954) (stating that the ex post facto bar only applies to criminal laws, not civil regulatory laws); *Calder v. Bull*, 3 U.S. 386, 390 (1798) (same); *id.* at 399 (Iredell, J., concurring) (same).

¶79 But our dissenting colleague is wrong to conclude that simply because *Smith* and *Noble* applied the intent/effects test in the ex post facto context, the test does not apply to other constitutional contexts, including the Sixth Amendment. To the contrary, the test has its "earlier origins in cases under the Sixth and Eighth Amendments," and has been applied "in various constitutional contexts." *Smith*, 538 U.S. at 97; *see also Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 nn.22–29 (1963) (listing cases using the intent/effects test in various constitutional contexts).

¶80 Thus, for example, the Supreme Court applied the intent/effects test in the Sixth Amendment context in *Mendoza-Martinez*. There, the Court addressed a civil statutory scheme divesting a person of citizenship for leaving the country to evade military service. 372 U.S. at 146. The "basic question" before the Court was whether these statutes were

"essentially penal in character, and consequently have deprived the appellees of their citizenship . . . without according them the rights guaranteed by the Fifth and *Sixth Amendments*, including notice, confrontation, compulsory process for obtaining witnesses, *trial by jury*, and assistance of counsel." *Id.* at 164 (emphasis added). To resolve this question, the Courts used the "tests traditionally applied to determine whether an Act of Congress is penal or regulatory in character"—namely, the intent/effects test. *Id.* at 168–69.

¶81 Applying this test, *Mendoza-Martinez* held that the statutory scheme was criminal, not civil. *Id.* at 164, 168–70. In reaching this holding, the Court stated that the statutes were "invalid" because Congress "employed the sanction of deprivation of nationality as a punishment . . . without affording the procedural safeguards guaranteed by the Fifth and Sixth Amendments." *Id.* at 165–66. Specifically, the statutory scheme deprived citizens of several constitutional rights, including the right to "be tried by an impartial jury." *Id.* at 166 (citation omitted) (internal quotation marks omitted). The Court concluded that the "Fifth and Sixth Amendments mandate" that statutes imposing forfeiture of citizenship "cannot be imposed without a prior criminal trial and all its incidents, including indictment, notice, confrontation, jury trial, assistance of counsel, and compulsory process for obtaining witnesses. If the sanction these [statutes] impose is punishment, and it plainly is, the procedural safeguards required as incidents of a criminal prosecution are lacking." *Id.* at 167.

¶82 In *United States v. Ward*, the Court addressed a statute imposing fines for illegally discharging oil into navigable waters. 448 U.S. 242, 245 (1980). The question before the Court was "whether Congress, despite its manifest intention to establish a civil, remedial mechanism, nevertheless provided for sanctions so punitive as to transfor[m] what was clearly intended as a civil remedy into a criminal penalty." *Id*. 448 U.S. at 249 (citation and internal quotation marks omitted). Applying the intent/effects test, the Court concluded that the statute was "clearly not 'criminal' enough to trigger the protections of the Sixth Amendment, the Double Jeopardy Clause of the Fifth Amendment, or the other procedural guarantees normally associated with criminal prosecutions . . . ." *Id*. at 248–51, 253–54.

¶83 As these cases demonstrate, the Supreme Court has consistently applied the intent/effects test to determine whether constitutional criminal protections, including the Sixth Amendment, apply to a statute. *See Hudson v. United States*, 522 U.S. 93, 96, 99–105 (1997)

(reaffirming the "established rule" that the intent/effects test is used to determine whether constitutional criminal protections apply to a statute); *id*. at 112–13 (Souter, J., concurring) (stating that "there is obvious sense in employing common criteria to point up the criminal nature of a statute for purposes of both the Fifth and Sixth Amendments," and "once it is understood that a legislature intended a penalty to be treated as civil in character, that penalty may be held criminal for Fifth Amendment purposes (and, for like reasons, under the Sixth Amendment) only on the "clearest proof" of its essentially criminal proportions."); *Flemming v. Nestor*, 363 U.S. 603, 612–13, 617–20 (1960) (stating that whether certain constitutional protections apply to a statute, including the Sixth Amendment, depends upon whether the intent and effects of the statute are criminal or civil); *Lipke v. Lederer*, 259 U.S. 557, 559, 562 (1922) (stating that simply because the title of a statute categorizes it as civil, if the "function" and effect of the statute is criminal, then depriving a person subject to the statute of an "information, indictment, or trial by jury, [is] contrary to the federal Constitution").

¶84 In short, the dissent is wrong. The intent/effects test is used in all contexts to determine whether constitutional criminal protections apply to a statute, including the Sixth Amendment's guarantee of a jury trial. *See, e.g.*, *Worthy v. City of Phenix City, Ala.*, 930 F.3d 1206, 1217–22 (11th Cir. 2019) (applying the intent/effects where defendants alleged that an "ordinance imposed a criminal penalty without providing sufficient Fifth and Sixth Amendment protections"; the court held, after addressing the "threshold question" of whether the "ordinance provides for civil sanctions or criminal punishment," that because these protections are only guaranteed during a criminal prosecution, and the ordinance imposes a civil sanction, "the procedures prescribed by the ordinance are constitutionally sufficient.").

¶85 Accordingly, we reject the argument of our dissenting colleague and Trujillo that the "serious offense" framework set forth in *Blanton* and *Fushek* applies in this case. *Blanton* and *Fushek* do not, as the dissent and Trujillo contend, address *Apprendi*, nor do they justify expanding the Sixth Amendment right to a jury trial in a criminal case to include civil regulatory requirements.

## CONCLUSION

¶86 Because Arizona's sex offender registration statutes are civil regulatory requirements, *Apprendi* does not apply to factual findings that

24

are necessary to impose registration.  We therefore hold that the trial judge did not violate *Apprendi* by determining that, pursuant to § 13-3821(A)(3), M.A.C. was under eighteen.  For these reasons, we affirm the trial court's judgment, and vacate the court of appeals' opinion.

BOLICK, J., dissenting:

¶87	The definitive question before us in deciding whether Trujillo had the right to a jury finding of the victim's age is whether the legislature, by virtue of the penalties it assigned to the conduct, considered the underlying offense serious. *See*, *e.g.*, *Blanton v. City of N. Las Vegas, Nev.*, 489 U.S. 538, 541 (1989); *see also Derendal v. Griffith*, 209 Ariz. 416, 423 ¶ 26 (2005) (adopting a "modified version of the *Blanton* test" that "preserves the right to jury trial for serious offenses"). As there can be no doubt that the penalties imposed by the legislature make clear it considers sexual abuse a serious crime, I respectfully dissent from the majority's holding that the jury finding is not constitutionally required.

¶88	The majority errs by failing to apply the framework the United States Supreme Court and this Court have consistently applied to the right to jury trial and instead choosing to apply one that pertains to other contexts, particularly ex post facto laws. Which analytical framework we apply matters greatly for they lead to different outcomes. By applying the wrong framework, the majority diminishes the right to jury trial protected by both the United States and Arizona Constitutions. U.S. Const. amend. VI; Ariz. Const. art. 2, § 23.[2]

¶89	The two contexts are materially different. The Ex Post Facto Clause of Article 1, Section 9 of the U.S. Constitution is a limitation on legislative power. *See*, *e.g.*, *Rogers v. Tennessee*, 532 U.S. 451, 455–56 (2001). Specifically, it generally prohibits imposition of retroactive criminal punishments. *Calder v. Bull*, 3 U.S. 386, 389–90 (1798). Given that purpose, in determining whether application of a particular statutory scheme violates the Ex Post Facto Clause, the proper inquiry is whether the scheme imposes a retroactive punishment, which involves determining whether the penalty is punitive or regulatory. *See Smith v. Doe*, 538 U.S. 84, 92 (2003); *accord State v. Noble*, 171 Ariz. 171, 175 (1992).

¶90	By contrast, the right to jury trial is a fundamental constitutional right that applies in all criminal prosecutions. Distinct from the Ex Post Facto Clause, which determines whether a punishment imposed

---

[2] Article 2, section 23 of the Arizona Constitution states in pertinent part: "The right of trial by jury shall remain inviolate." Because Trujillo did not meaningfully develop a distinct argument under this provision, the Court is correct not to consider it.

by the legislature is permissible, the Sixth Amendment dictates the rules by which a defendant's guilt or innocence is determined. Thus, the appropriate constitutional analysis differs. To determine whether the right to jury trial is implicated, the courts inquire not whether the penalty is punitive or regulatory, but whether the penalty imposed reflects a legislative determination that the underlying offense is serious. *See*, *e.g.*, *Frank v. United States*, 395 U.S. 147, 149 (1969); *Fushek v. State*, 218 Ariz. 285, 289 ¶ 11 (2008).

¶91 The two inquiries sound superficially similar, but in this case it is easy to see how the outcome would be markedly different. The majority engages in an extensive *Smith/Noble* inquiry and concludes that the mandatory sexual registry requirement is regulatory rather than punitive. That is a conclusion with which I do not necessarily disagree, given the similarities between our registration scheme and the one at issue in *Smith*.

¶92 But that inquiry is simply beside the point. This case does not involve retroactively applying legislation. It is a criminal prosecution. By its terms, the Sixth Amendment applies "[i]n all criminal prosecutions." U.S. Const. amend. VI. By failing to apply the Sixth Amendment framework that pertains to all criminal cases, the Court by its decision today carves out a Sixth-Amendment-free zone in a critical component of a criminal trial.

¶93 Indeed, this Court expressly rejected the analysis applied by the majority here only eleven years ago in *Fushek*, in which the Court made the proper analysis crystal clear: "The issue before us is not whether sex offender registration is criminal punishment for ex post facto purposes, but rather whether it is a statutory consequence reflecting a legislative determination that Fushek's alleged offenses are 'serious.'" 218 Ariz. at 290 ¶ 19. The Court categorically rejected the use of the factors from *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963), upon which the majority relies today, *supra* ¶ 34, declaring in the most unequivocal terms: "The test does not measure whether a sanction is sufficiently severe to trigger the right to jury trial under the Sixth Amendment." 218 Ariz. at 290 ¶ 19.

¶94 Instead, the Court in *Fushek* examined the sexual registry requirement to determine whether it evidences legislative intent that the underlying offense is serious. Unsurprisingly, the Court held that "the potential of sex offender registration reflects a legislative determination that Fushek has been charged with serious crimes." *Id.* at 292 ¶ 30. So has Trujillo.

¶95　　　　Here, the fact that the victim is below the age of eighteen transforms discretionary registration into mandatory registration. If the *possibility* of registration demonstrated that the legislature considered the underlying crime serious in *Fushek*, surely *mandatory* registration does not diminish that conclusion. As the crime here, in effect, is sexual abuse of a minor, all of the facts necessary for conviction—including the fact that the victim was a minor—must be found by the jury.

¶96　　　　In *Blanton*, the Supreme Court established a dividing line between petty offenses, which do not require a jury trial, and serious offenses, which do. That line, the Court stated, is based on "the seriousness with which society regards the offense," as reflected by the maximum penalty assigned to the crime. 489 U.S. at 541 (quoting *Frank*, 395 U.S. at 148). Such a penalty encompasses not only prison sentences but any penalty that entails "a significant infringement of personal freedom," including fines or probation. *Id.* at 542 (citation omitted).

¶97　　　　The majority acknowledges this very point, noting that *Blanton* determined whether the underlying crime is serious based on "both the civil regulatory requirements and criminal penalties that accompany a conviction." *Supra* ¶ 67 (citing *Blanton*, 489 U.S. at 544–45 & n.9). The majority goes on to cite other Arizona cases in which a crime was deemed serious for Sixth Amendment right to jury purposes based on accompanying civil penalties. *Id.* (citing *Derendal*, 209 Ariz. at 425–26 ¶ 40 & n.9 (loss of driver's license); *Buccellato v. Morgan*, 220 Ariz. 120, 125 ¶ 13 n.5 (App. 2008) (revocation of business permit)). These cases all underscore that the proper inquiry for determining a jury trial right is not whether the penalties are regulatory or punitive, an inquiry the majority engages in at great but irrelevant length, but whether they demonstrate that the underlying crime is serious.

¶98　　　　Following *Blanton*, the Supreme Court ruled in *Apprendi v. New Jersey* that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). Specifically, this requirement encompasses "facts that increase the prescribed range of penalties to which a criminal defendant is exposed." *Id.* (quoting *Jones v. United States*, 526 U.S. 227, 252–53 (1999)). Unquestionably, the statute at issue here does precisely that.

28

**¶99**         In *Alleyne v. United States*, the Court held that any fact that increases a mandatory minimum sentence for a crime is an element of that crime and therefore must also be found by the jury.  570 U.S. 99, 103 (2003).  This, the Court held in an opinion by Justice Thomas, is "the essential Sixth Amendment inquiry."  *Id.* at 114.  Thus, "[w]hen a finding of fact alters the legally prescribed punishment so as to aggravate it," the Court held, "the fact necessarily forms a constituent part of a new offense and must be submitted to the jury."  *Id.* at 114–15.  That is exactly how the statute operates here:  the fact of a victim younger than eighteen increases the mandatory minimum penalty and transforms a discretionary into mandatory life-long registration requirement.  A.R.S. § 13-3821(A)(4), (C).  That predicate fact must therefore be proved beyond a reasonable doubt to the jury.

**¶100**         The Court made clear in *Southern Union Co. v. United States* that *Apprendi*'s jury factfinding requirement applies not only to prison sentences, but also to other penalties such as criminal fines.  567 U.S. 343, 346, 350 (2012).  The relevant inquiry is not the nature of the penalty, but whether it is petty or substantial.  *Id.* at 350–51 (stating that "not all fines are insubstantial, and not all offenses punishable by fines are petty").  Here, regardless of the level of offense, lifelong registration is a serious penalty, as we stated in *Fushek*.  *See* 218 Ariz. at 292–93 ¶ 30.  Thus, the jury must find any fact that increases the penalty.

**¶101**         Most recently, in *United States v. Haymond*, 139 S. Ct. 2369 (2019), the Court held that a jury must find the facts on which a revocation of supervised release and imposition of an additional mandatory prison term is based.  After reviewing the relevant precedents, the plurality opinion by Justice Gorsuch noted, "By now, the lesson for our case is clear." *Id.* at 2378 (plurality). When a defendant is exposed to an additional penalty for a serious offense, the facts triggering that penalty must be found not by the judge but by a jury.  *Id.*

**¶102**         The right to jury trial cases consider an array of civil and criminal penalties, without pausing to determine whether they are punitive or regulatory.  Rather, the inquiry is whether the penalties, taken together, demonstrate that the legislature considers the underlying crime serious.  If so, all of the facts that determine whether a particular penalty applies must be determined by a jury.

¶103 These decisions point inexorably to the correct outcome here. As this case implicates the right to jury trial, not the constitutional constraint on ex post facto laws, the *Blanton/Apprendi* framework rather than the *Smith/Noble* framework applies. *See Fushek*, 218 Ariz. at 290 ¶ 19.

¶104 Applying the appropriate framework, this Court in *Fushek* concluded that the potential for sex registration reflects a legislative determination that the underlying offense is serious. *Id.* at 292 ¶ 30. That conclusion triggers the right to jury trial (*Blanton*). The jury must determine every fact that gives rise to an increased penalty (*Apprendi*, *Alleyne*, *Haymond*). Therefore, Trujillo was entitled to a jury finding that the sexual abuse victim was below eighteen years of age.

¶105 The majority acknowledges the relevant right to jury trial cases, but contends that *Blanton* "does not provide a useful framework for this case," because it "provides no assistance" in determining whether "Arizona's registration statutes are civil or criminal," which the majority contends is the question at issue. *Supra* ¶ 69.

¶106 With respect, it is not. As noted, *Fushek* decides precisely, in the context of Arizona's sex offender registration statutes, that the criminal/civil framework does not apply in the right to jury context. 218 Ariz. at 290 ¶ 19. As the majority correctly states, "*Fushek* held that because the underlying *offenses* were serious, the defendant was entitled to a jury trial on those offenses." *Supra* ¶ 72. Thus, the jury trial requirement is based on the seriousness of the underlying crime, not the *Mendoza-Martinez* factors. And as the Court held in *Fushek*, sex offender registration is a serious consequence, one invoking the right to a jury trial. As a necessary corollary, the jury must find all facts necessary to sustain conviction where a crime carries registration as a penalty. The majority does not explain what has happened in the intervening eleven years to make *Fushek*'s reasoning obsolete or inapplicable.

¶107 The Sixth Amendment jury trial framework that applies here, and the *Smith* line of cases that apply in the ex post facto context and others, are well-developed and serve important but very different purposes, and they do not properly intertwine. The number of U.S. Supreme Court decisions that have applied the *Mendoza-Martinez* factors in the Sixth Amendment right to jury context is zero. Before today, the number of times this Court has applied the *Mendoza-Martinez* factors in the Sixth Amendment context was also zero.

¶108        The Supreme Court cases the majority cites, *supra* ¶¶ 82–83, either predate *Mendoza-Martinez* or deal with contexts other than the right to jury trial in a criminal prosecution. *See Hudson v. United States*, 522 U.S. 93 (1997) (Double Jeopardy Clause of the Fifth Amendment); *United States v. Ward*, 448 U.S. 242 (1980) (civil proceeding involving penalty for oil discharge); *Mendoza-Martinez*, *supra* ¶¶ 80–81 (civil proceeding to divest individual of citizenship). Indeed, another case cited by the majority, *supra* ¶ 84, makes the line of demarcation clear, applying the *Mendoza-Martinez* factors in the context of a red-light running violation, noting that the Sixth Amendment right to jury trial right is "only guaranteed during a criminal prosecution," whereas in that case the appellants had not "alleged that there was even a remote threat of future criminal prosecution." *Worthy v. City of Phenix City, Ala.*, 930 F.3d 1206, 1220 (11th Cir. 2019). By contrast, the Court has consistently applied the *Blanton/Apprendi* framework in *all* cases involving the right to jury trial in criminal prosecutions, and we should do so here.

¶109        The majority also cites a handful of state cases that apply the *Mendoza-Martinez* factors in the Sixth Amendment context,[3] but we should not follow their error, particularly when U.S. Supreme Court precedents and our own precedents are so very clear. *See, e.g.*, *Haymond*, 139 S. Ct. at 2378. Under our system of federalism, we are free to expand the rights recognized by the U.S. Supreme Court, but not to contract them. *California v. Ramos*, 463 U.S. 992, 1013–14 (1983) ("It is elementary that States are free to provide greater protections in their criminal justice system than the Federal Constitution requires."). That is what the majority does today by substituting the framework consistently applied by the Supreme Court with one that produces less protection for criminal defendants than the Sixth Amendment requires.

---

[3] Indeed, not all the cases cited by the majority entail *mandatory* penalties, which is significant for analysis under *Alleyne*, *supra*. In *People v. Mosley*, 344 P.3 788, 789 (Cal. 2015), the issue was whether the judge may "make[] the findings underlying his or her discretionary order that a convicted criminal defendant must register as a sex offender." Trujillo is challenging a mandatory registration provision, not one within the judge's discretion. Indeed, a conviction for sexual abuse allows a judge to impose registration at his discretion, and Trujillo was convicted of sexual abuse by a jury. The issue here is that the judge, after finding the victim was a minor, was required to assign registration as a mandatory minimum for sexual abuse of a minor.

¶**110**　　　At the end of the day, the Court's incorrect holding likely bodes no consequence for Trujillo, because *Apprendi* errors are subject to harmless error review.  *See*, *e.g.*, *State v. Ring*, 204 Ariz. 534, 554–55 (2003). *But see Neder v. United States*, 527 U.S. 1, 31–32 (1999) (Scalia, J., concurring in part and dissenting in part) (suggesting that such error is structural and never harmless because "the basis . . . is precisely that . . . the Constitution does not trust judges to make determinations of criminal guilt" (emphasis omitted)).  But the Court's reasoning surely will have serious adverse consequences for the accused in future cases.

¶**111**　　　In reaching its conclusion, the majority boarded the wrong train on the wrong tracks to the wrong destination.  In so doing, it derailed the right to jury determination of a factual predicate to a lifelong registration obligation.  With great respect to my colleagues, I dissent.