IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**JOEL CARSON,**
*Petitioner,*

*v.*

**HON. JO LYNN GENTRY, JUDGE OF THE SUPERIOR COURT OF THE STATE OF ARIZONA, IN AND FOR THE COUNTY OF MARICOPA,**
*Respondent/Judge,*

**STATE OF ARIZONA EX REL. RACHEL MITCHELL, MARICOPA COUNTY ATTORNEY,**
*Real Party in Interest.*

---

**STATE OF ARIZONA,**
*Petitioner,*

*v.*

**HON. KERSTIN LEMAIRE, JUDGE OF THE SUPERIOR COURT OF THE STATE OF ARIZONA, IN AND FOR THE COUNTY OF MARICOPA,**
*Respondent/Judge,*

**JOEL MCCLAIN CARSON,**
*Real Party in Interest.*

---

No. CR-24-0191-PR
CR-24-0207-PR
(Consolidated)
Filed August 20, 2025

---

Appeal from the Superior Court in Maricopa County
The Honorable Jo Lynn Gentry, Judge
No. CR2022-006384-001
**AFFIRMED**

Order of the Court of Appeals, Division One
Filed Apr. 22, 2024
**VACATED**


Opinion of the Court of Appeals, Division One
553 P.3d 197 (App. 2024)
**VACATED**

———————————

COUNSEL:

Sherri McGuire Lawson, Office of the Legal Defender, Kush Govani (argued), John Champagne, Scott Boncoskey (argued), Deputy Legal Defenders, Phoenix, Attorneys for Joel McClain Carson

Rachel H. Mitchell, Maricopa County Attorney, Quinton S. Gregory (argued), Deputy County Attorney, Phoenix, Attorneys for State of Arizona and Rachel H. Mitchell

Gary Kula, Maricopa County Public Defender, Katie Krejci, David Hintze, Mikel Steinfeld, Grahame McNevin, Adna Zeljkovic, Deputy Public Defenders, Phoenix, Attorneys for Amicus Curiae Maricopa County Public Defender's Office

Kate Milewski, Pinal County Public Defender, Kevin D. Heade, Defender Attorney, Florence, Attorneys for Amicus Curiae Pinal County Public Defender's Office

———————————

VICE CHIEF JUSTICE LOPEZ authored the Opinion of the Court, in which CHIEF JUSTICE TIMMER, JUSTICES BOLICK, BEENE, and KING joined.[*]

———————————

[*] Justices William G. Montgomery and Maria Elena Cruz recused themselves from this matter.

VICE CHIEF JUSTICE LOPEZ, Opinion of the Court:

**¶1** We consider whether the State may refile criminal charges, without prior judicial approval, against a defendant previously found not competent and not restorable ("NCNR"). Here, the State refiled charges against Joel McClain Carson after the trial court dismissed the charges upon finding him NCNR. The State contended that it could refile charges because new information suggested Carson's competency status changed. Carson moved to dismiss the charges, arguing that *Johnson v. Hartsell*, 254 Ariz. 585 (App. 2023), required the State to obtain judicial approval before refiling charges. We explain today the reason for our prior decision order authorizing the State to refile charges without judicial preapproval.

**¶2** We hold that due process does not require the State to obtain judicial approval before refiling charges against an NCNR defendant. In doing so, we overrule paragraphs 22–27 of *Johnson*, and affirm *Rider v. Garcia*, 233 Ariz. 314 (App. 2013), as the proper standard for refiling charges when a defendant is determined NCNR. We further hold that, because A.R.S. § 13-4517(A)(4) applies retroactively, the State may pursue a dangerousness trial or it may attempt to rebut the presumption of incompetency.

## BACKGROUND

**¶3** This case's procedural complexity—three prosecutions, multiple dismissals, and numerous appellate actions—is inextricably intertwined with and reflects the legal complexity concerning the State's authority to refile charges against an NCNR defendant.

**¶4** In May 2018, the State charged Carson with first degree murder and several related felonies in CR2018-124276 (the "2018 Case"). Carson, a diagnosed schizophrenic, moved for a referral to competency proceedings under Arizona Rule of Criminal Procedure ("Rule") 11. The trial court granted the motion.

**¶5** In July 2021, the court found Carson incompetent under A.R.S. § 13-4510(C) and ordered involuntary treatment. After nearly a year of treatment, in June 2022, the court found Carson still incompetent under § 13-4517(A) and determined there was "no substantial probability" of

restoration within 21 months of the July 2021 determination. Accordingly, the court dismissed the 2018 Case without prejudice and ordered a civil commitment evaluation at Valleywise Behavioral Health Center ("Valleywise").

¶6            Valleywise discharged Carson on July 15, 2022. Ten days later, the State reindicted him for the same charges from the 2018 Case and added a new felony charge for misconduct involving weapons in CR2022-006384 (the "2022 Case").

¶7            While other motions were pending in the 2022 Case, the court of appeals issued *Johnson*, which held that prosecutors must obtain court approval before refiling charges previously dismissed due to incompetency. 254 Ariz. at 591–92 ¶¶ 22–27. In light of *Johnson*, the State filed a motion requesting the court retroactively authorize the refiled charges, asserting a "good faith belief" that Carson may be restorable given his discharge and subsequent year-long treatment. Carson moved to dismiss the charges in the 2022 Case, arguing that *Johnson* barred the charges because the State showed no reasonable basis to believe he was now competent.

¶8            In March 2023, the trial court held that Carson's release from Valleywise supported a reasonable belief that there was a change in competency. The court dismissed the 2022 Case without prejudice and granted leave to refile.

¶9            Following the court's March 2023 orders, the State refiled the charges from the 2022 Case in CR2023-000872 (the "2023 Case"). Carson again moved to dismiss, arguing that any change in his competency was insufficient to overcome the presumption of incompetency established in June 2022. A different trial court judge granted Carson's motion and dismissed the 2023 Case without prejudice. The court reasoned that the State lacked "a reasonable belief that [Carson] regained competency" before refiling the charges in the 2023 Case.

¶10           The State sought special action review. *State ex rel. Mitchell v. LeMaire* ("*Carson I*"), 255 Ariz. 544, 545 ¶ 1 (App. 2023). The court of appeals "accepted jurisdiction, set aside the dismissal order, and remanded to the court for a competency examination or other proceedings to determine Carson's current competency status." *Id.* at 546 ¶ 11.

¶11　　　　After the court of appeals issued its decision in *Carson I*, Carson moved the trial court to reconsider the earlier order granting the State refile authority. The court denied the motion, reasoning that the 2023 Case provided the State an opportunity to redetermine Carson's competency.

¶12　　　　Carson sought special action review. The court of appeals accepted jurisdiction and vacated the orders granting leave to refile and denying reconsideration. *Carson v. Gentry* ("*Gentry I*"), No. 1 CA-SA 24-0067, at 2–3 (Ariz. App. Apr. 22, 2024) (order). The court stayed its ruling for fourteen days to allow any party to seek relief under § 13-4517(A), including civil commitment, protective appointment, or a dangerousness trial. *Id.* at 3. The State petitioned the trial court to order a § 13-4517(A)(4) dangerousness trial in the 2023 Case. The court denied the request.

¶13　　　　The State filed another special action petition challenging the denial in the 2023 Case. In response, Carson urged the court to dismiss the 2023 Case entirely because the *Gentry I* panel vacated the refile authorization. A different court of appeals panel disagreed with Carson and ordered supplemental briefing. *State v. LeMaire* ("*LeMaire I*"), No. 1 CA-SA 24-0089 at 2–3 (Ariz. App. May 22, 2024) (order).

¶14　　　　While pursuing special action relief in the 2023 Case, the State also filed two emergency requests to extend the *Gentry I* panel's stay on the decision order in the 2022 Case. The State explained that § 13-4517(A)(4) "requires pending charges in order for the State to request a dangerous[ness] trial" and that it understood the "decision order to vacate those charges." The court granted both requests and extended the stay until further notice. *Carson v. Gentry* ("*Gentry II*"), No. 1 CA-SA 24-0067, at 1 (Ariz. App. May 3, 2024) (order); *Carson v. Gentry* ("*Gentry III*"), No. 1 CA-SA 24-0067, at 1 (Ariz. App. May 17, 2024) (order).

¶15　　　　After the State filed its special action petition in the 2023 Case, Carson moved to vacate the orders to stay the 2022 Case. He argued that the premise for the State's emergency request no longer existed, as the State argued in its petition in the 2023 Case that § 13-4517(A)(4) did not require pending charges. About a month later, the court of appeals vacated the stay in the 2022 Case. *Carson v. Gentry* ("*Gentry IV*"), No. 1 CA-SA 24-0067, at 1 (Ariz. App. July 9, 2024) (order).

¶16      That same day, the court of appeals issued *Carson v. Gentry* ("*Carson II*"), 258 Ariz. 89 (App. 2024).  Applying *Johnson*, the court held that the trial court erred in permitting the State to refile charges against Carson because it failed to present "sufficient information to support a reasonable belief that Carson may have regained competency."  *Id.* at 93 ¶ 13.  The *Carson II* court reasoned that Carson's treatment compliance and release from Valleywise were "not enough to overcome the presumption of incompetency."  *Id.* ¶ 16.  The court therefore vacated "the trial court's orders denying Carson's motion to reconsider its ruling and permitting the State to refile the charges."  *Id.* at 94 ¶ 17.

¶17      Carson then moved to dismiss the State's pending special action petition in the 2023 Case as moot.  While this motion was pending, the trial court dismissed the charges in the 2023 Case without prejudice.  The *LeMaire I* panel then dismissed the State's pending special action petition and the 2023 Case as moot.  *State v. LeMaire* ("*LeMaire II*"), No. 1 CA-SA 24-0089, at 1 (Ariz. App. July 29, 2024) (order).

¶18      The State then petitioned this Court to review *Carson II* and the dismissal of the 2023 Case.  We granted review.  At oral argument on May 13, 2025, Carson's counsel told the Court that Carson was currently admitted to a behavioral health facility for civil commitment.  The next day, the Court issued an order directing the parties to "immediately inform the Court of Petitioner's imminent release from a secure facility."  Upon learning from Carson's counsel on May 22 that Carson was not in a secure facility, the Court immediately issued a Decision Order, which allowed the matter "to proceed in the superior court pending the Court's opinion."  In that order, we held that the court of appeals erred by vacating the trial court's ruling in the 2022 Case that had permitted the State to refile charges against Carson.  We also clarified two points.  First, we overruled paragraphs 22–27 of *Johnson* and affirmed *Rider* as "the correct operative standard for the State to refile charges following a superior court's determination that a defendant is not competent to stand trial."  Second, we affirmed the trial court's denial of Carson's motion for reconsideration in the 2022 Case and remanded this matter to the trial court for the State to attempt to either (1) rebut the presumption of incompetency and continue the prosecution, or (2) file a petition for a dangerousness trial.  We noted that "[a]n opinion explaining our reasoning in this order will issue in due

course." This is that Opinion. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

¶19 This case's procedural odyssey implicates the viability of the jurisprudence concerning the State's authority to refile charges against an NCNR defendant and other issues, including (1) whether the State must obtain judicial preapproval before refiling charges against an NCNR defendant; (2) whether the *Carson II* court erred; and (3) whether the State can petition for a dangerousness trial or invoke other procedural options.

## I.

¶20 We begin by examining whether the State's authority to refile charges against an NCNR defendant is contingent upon the State obtaining prior judicial approval to refile.

¶21 A defendant is "[i]ncompetent to stand trial" if, "as a result of a mental illness, defect or disability [he or she is] unable to understand the nature and object of the proceeding or to assist in the defendant's defense." A.R.S. § 13-4501(3); *see also* Ariz. R. Crim. P. 11.1(a)(2). Arizona statutory law and constitutional due process principles prohibit the State from prosecuting an incompetent defendant. *See* A.R.S. § 13-4502(A) ("A person shall not be tried, convicted, sentenced or punished for an offense if the court determines that the person is incompetent to stand trial."); *Medina v. California*, 505 U.S. 437, 439 (1992) ("It is well established that [due process] prohibits the criminal prosecution of a defendant who is not competent to stand trial."). Therefore, under § 13-4517(A)(3) and Rule 11.5(b)(3)(iii), courts may dismiss charges without prejudice upon deeming a defendant NCNR, consistent with due process concerns.

¶22 Here, the trial court dismissed Carson's original charges in the 2018 Case when it deemed him NCNR. But after Valleywise discharged Carson post-dismissal, the State refiled those charges, initiating the 2022 Case. Carson, however, moved to dismiss those charges, citing *Johnson*, which held that prosecutors must obtain court approval before refiling charges previously dismissed due to incompetency. 254 Ariz. at 591–92 ¶¶ 22–27. The State then sought retroactive court permission to refile charges against Carson. The trial court dismissed the 2022 Case

without prejudice but granted the State permission to refile, which culminated in the 2023 Case.

¶23        The dispute about the State's refiling authority can be distilled to whether *Johnson* properly requires the State to obtain prior judicial approval before refiling charges.  In *Johnson*, the court of appeals addressed "what is necessary to start the criminal or probation revocation proceeding after a court has dismissed it based on a finding of incompetency."  *Id.* at 591 ¶ 21.  It answered the question by imposing a new requirement absent from any Arizona case, statute, or rule: "the State [must] provide information to the court *before* refiling that supports a reasonable belief that the defendant has regained competency."  *Id.* ¶ 25 (emphasis added).  Only if the court agrees, *Johnson* reasoned, may the State refile and parties may then request a new competency exam.  *Id.*  The court justified this requirement as a safeguard against a "revolving door" of prosecutions based on past acts where the defendant remains presumptively incompetent.  *Id.* at 592 ¶ 26.  But in its zeal to prevent a "revolving door," *Johnson* confused the path back into court with the standard for staying out; it conflated the rules for refiling charges with those for rebutting the incompetency presumption.  And in doing so, *Johnson* required the judiciary to assume the executive's prerogative.

## A.

¶24        First, *Johnson* relied solely on *State v. Bradley*, 102 Ariz. 482, 487 (1967), *overruled in part on other grounds by State v. Harvill*, 106 Ariz. 386, 391 (1970), for the judicial preapproval requirement.  *See Johnson*, 254 Ariz. at 591 ¶ 25 (citing *Bradley*).  But *Bradley* does not support *Johnson*'s preapproval requirement because it addressed the standard for overcoming the presumption of incompetency, not the standard for refiling charges.  *See Bradley*, 102 Ariz. at 487 (providing that the State overcomes the presumption of incompetency when restoration evidence "is accepted as satisfactory by counsel for the accused, the prosecution, and *by the court* on the basis of the record before it" (emphasis added)).

¶25        *Johnson*'s erroneous reliance on *Bradley* culminated in two fundamentally incorrect principles: (1) the judicial preapproval requirement, and (2) conflation of the refiling and incompetency presumption rebuttal standards.  *See Johnson*, 254 Ariz. at 591–92 ¶¶ 25–26 ("If the [s]tate cannot allege evidence to a court supporting its reasonable

8

belief that a person is now competent, it has not overcome the incompetency presumption and may not arrest a person for the dismissed charges."). This analysis effectively requires the State to rebut the presumption of incompetency before it can refile charges—a standard not required by statute or jurisprudence.

¶26 The protections required to *try* an incompetent defendant differ from the decision to *charge* one. Due process is squarely implicated if an incompetent person is "*tried*, convicted, sentenced or punished for an offense." *See* § 13-4502(A) (emphasis added); *Medina*, 505 U.S. at 449. This bar exists because competency is fundamental to a trial's fairness. As the U.S. Supreme Court has explained, a competent defendant can exercise critical rights: the right to counsel, to confront witnesses, to testify or remain silent, and to present a defense. *See Riggins v. Nevada*, 504 U.S. 127, 139–40 (1992) (Kennedy, J., concurring).

¶27 But initiating charges is distinguishable from trying a defendant. Black's Law Dictionary defines "try" as "[t]o examine judicially; to examine and resolve (a dispute) by means of a trial." *Try*, Black's Law Dictionary (12th ed. 2024). "Trial" is "[a] formal judicial examination of evidence and determination of legal claims in an adversary proceeding." *Trial*, Black's Law Dictionary (12th ed. 2024). Meanwhile, "charge" is defined as "[a] formal accusation of an offense as a *preliminary step to prosecution*." *Charge*, Black's Law Dictionary (12th ed. 2024) (emphasis added). And "prosecution" is "[a] criminal proceeding in which an accused person is tried." *Prosecution*, Black's Law Dictionary (12th ed. 2024). Charging is an early procedural step in initiating a prosecution. But it does not subject the accused to conviction or punishment. Without a trial, the constitutional implications of incompetency are diminished.

¶28 To be sure, charging an incompetent defendant implicates due process concerns that are "inherent in holding pending criminal charges indefinitely over the head of one who will never have a chance to prove his innocence." *See Jackson v. Indiana*, 406 U.S. 715, 740 (1972). But these concerns do not necessarily culminate in constitutional violations upon refiling charges. Neither Arizona statutes, court rules, nor due process requirements justify judicial intervention in a prosecutor's charging

discretion concerning persons previously adjudicated NCNR.[1]  Instead, separation of powers concerns weigh heavily against a court-created preapproval rule.

**B.**

**¶29**       *Johnson* incorrectly empowers judges to commandeer the charging decision—a core executive function.  The U.S. Supreme Court delineated the constitutional boundary between the executive and judicial branches concerning charging decisions in *United States v. Texas*, 599 U.S. 670, 678–80 (2023).  There, the Court explained that "the Executive Branch—not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States," and that law enforcement discretion is "deep[ly]-rooted" in tradition.  *Id.* at 679, 682 (citation omitted); *see also Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) (noting the "deep-rooted nature of law-enforcement discretion").  This reflects a longstanding principle that charging decisions generally rest solely with the executive branch.  *See Wayte v. United States*, 470 U.S. 598, 607 (1985) ("[T]he decision whether or not to prosecute . . . generally rests entirely in [the prosecutor's] discretion."(quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978))); *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (noting that prosecutors "retain 'broad discretion' to enforce the Nation's criminal laws" (quoting *Wayte*, 470 U.S. at 607)).

**¶30**       Arizona law aligns with this principle.  *See* Ariz. Const. art. 3 (describing the three governmental powers and declaring that no one branch "shall exercise the powers properly belonging to either of the others").  Prosecutors fall under the executive branch and their powers and duties "shall be as prescribed by law." *Id.* art. 5, § 9.  While the legislature defines crimes and punishments, this Court has long recognized that "[t]he

---

[1]  At oral argument, Carson argued that, as an arm of the court, the grand jury's probable cause determination for charges is analogous to *Johnson*'s judicial preapproval requirement.  We disagree.  Grand juries ensure that there is a sufficient basis for a criminal charge by "inquir[ing] into every *offense* which may be tried within the county."  *See* A.R.S. § 21-407(A) (emphasis added).  But grand juries do not condition charges on a defendant's mental health, nor do they limit a prosecutor's initial discretion to present charges—unlike the judicial gatekeeping mechanism required under *Johnson*, which bars prosecutors from initiating charges altogether.

prosecutor makes the determination whether to file criminal charges and which charges to file." *State v. Murphy*, 113 Ariz. 416, 418 (1976); *see also State v. Prentiss*, 163 Ariz. 81, 85 (1989) (acknowledging that "the executive branch has the power to decide what criminal charges to file"). That discretion does not dissipate once a court dismisses charges without prejudice. To the contrary, courts lack authority to override or supervise those decisions absent illegality or abuse of discretion. *State v. Frey*, 141 Ariz. 321, 324 (App. 1984) ("The courts have no power to interfere with the discretion of the prosecutor unless he is acting illegally or in excess of his powers." (quoting *Murphy*, 113 Ariz. at 418)); *see also J.V. v. Blair*, 256 Ariz. 247, 250 ¶ 13 (App. 2023) ("[T]he plain language of Arizona's constitution, statutes, and rules reveals the executive branch has *sole* discretion whether to prosecute . . . ." (emphasis added)).

¶31 Prosecutorial discretion includes deciding when to file charges and whether to refile them after dismissal. "A prosecutor 'is properly vested with both the power to charge . . . and the discretion to proceed to trial once a criminal action has been filed.'" *Villalpando v. Reagan*, 211 Ariz. 305, 311 ¶ 20 (App. 2005) (alteration in original) (quoting *State v. Ramsey*, 171 Ariz. 409, 413 (App. 1992)); *see also J.V.*, 256 Ariz. at 250 ¶ 13 ("The executive branch has broad discretion to decide whether to charge a defendant with a crime and, unless restricted by the legislature, whether and how to proceed."). And judicial oversight of prosecutorial discretion generally constitutes "inappropriate interference . . . with the broad discretion entrusted to the executive branch." *Villalpando*, 211 Ariz. at 311 ¶ 20.

¶32 In short, *Johnson*'s preapproval rule crosses a constitutional line: it inserts the judiciary into a core executive function—the decision whether to refile criminal charges. *Johnson*'s rule impermissibly collapses the constitutional separation between those who charge and those who judge.

## C.

¶33 We overrule the *Johnson* preapproval requirement and clarify that the *Rider* standard is the operative one for refiling charges against an NCNR defendant. Under *Rider*, the State may refile charges based on a reasonable belief that the defendant's competency may have been restored. *See* 233 Ariz. at 317 ¶ 11. This threshold is intentionally lower than the

presumption rebuttal standard. It permits the State to restart proceedings without first rebutting the presumption of incompetency, which remains in place until new competency proceedings are held.

¶34　　　The liberty interests at stake in incompetency proceedings trigger both substantive and procedural due process protections under the U.S. and Arizona Constitutions. *See* U.S. Const. amend. XIV, § 1; Ariz. Const. art. 2, § 4. As mentioned, the U.S. Constitution prohibits prosecuting a defendant who lacks competence to stand trial. *Medina*, 505 U.S. at 439. Arizona law recognizes the same prohibition. *See* § 13-4502(A). This rule is grounded in due process and is "fundamental to an adversary system of justice" because the law presumes mentally incompetent people cannot defend themselves. *Drope v. Missouri*, 420 U.S. 162, 171–72 (1975).

**1.**

¶35　　　*Rider* complies with substantive due process. Substantive due process requires that any detention bear a "reasonable relation to the purpose for which the individual is committed." *Jackson*, 406 U.S. at 738. In this context, the State cannot repeatedly refile charges merely to incarcerate someone who remains incapable of restoration to competency. *See Rider*, 233 Ariz. at 317 ¶ 10.

¶36　　　The *Rider* standard reflects this constitutional balance. Under that standard, the State cannot refile charges against an NCNR defendant without reasonable grounds that the defendant may have regained competence—thereby addressing *Johnson*'s "revolving door" prosecution concern. *See Johnson*, 254 Ariz. at 592 ¶ 26. But *Rider* stops short of conditioning executive prosecutorial discretion on judicial preapproval.

¶37　　　By contrast, *Johnson* repackaged due process concerns already handled by Rule 11 procedures. Due process safeguards do not require a court to greenlight recharging—they only require that no one be prosecuted while incompetent, and that no one be detained without reason. *See Jackson*, 406 U.S. at 738. *Rider* meets both ends. *Johnson* overshoots them.

**2.**

¶38　　　*Rider* also comports with procedural due process. A failure to "observe procedures adequate to protect a defendant's right not to be tried

or convicted while incompetent" violates due process. *Drope*, 420 U.S. at 172. Those procedures must not "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Medina*, 505 U.S. at 445 (quoting *Patterson v. New York*, 432 U.S. 197, 202 (1977)).

¶39        Carson argues that this Court should apply the U.S. Supreme Court's *Medina* analysis. In *Medina*, the Court evaluated a state competency procedure under the Due Process Clause. *Id.* at 442. The case centered on whether California's rule that placed the burden of proving incompetence on the defendant violated fundamental fairness. *See id.* at 440–42. The Court upheld the procedure, concluding it satisfied due process because it did not offend deeply-rooted principles of justice. *See id.* at 453. To reach that decision, the Court considered (1) the "historical treatment" of the procedure at common law and in "[n]ineteenth century" decisions, (2) "[c]ontemporary practice," and (3) whether the procedure "transgresses any recognized principle of 'fundamental fairness' in operation." *See id.* at 446–48 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). Carson urges us to follow this framework.

¶40        As for the "tradition" factor, Carson did not cite any case to support a historical rule requiring judicial permission to refile charges dismissed for incompetency. Instead, he relies on cases involving protections for convicted defendants, not the standard for refiling charges after dismissal. *See Spann v. State*, 47 Ga. 549, 550–51 (1873) (post-conviction sanity inquiry to stay execution); *State v. Dreher*, 38 S.W. 567, 567–68 (Mo. 1897) (post-conviction commitment after insanity finding); *Darnell v. State*, 5 S.W. 522, 522–23 (Tex. App. 1887) (insanity finding after conviction and before final judgment); *Laughlin v. Commonwealth*, 37 S.W. 590, 590–91 (Ky. App. 1896) (discussing insanity inquiry before sentencing); *State v. Pritchett*, 11 S.E. 357, 359 (N.C. 1890) (rejecting a rule requiring certification of competency from asylum authorities before prosecution could resume).

¶41        The "contemporary practice" consideration offers Carson no relief. First, *Medina* made clear that contemporary state practice is "of limited relevance to the due process inquiry." *See* 505 U.S. at 447. In any event, Carson concedes that contemporary state practice for "how prosecutions can recommence after an NCNR finding" varies.

**¶42** Finally, the *Medina* court also briefly considered whether the rule at issue transgressed "fundamental fairness." *Id.* at 448 (quoting *Dowling*, 493 U.S. at 352). Carson contends that a *Rider*-based system is fundamentally unfair because it gives prosecutors unfettered discretion to refile charges, risking repeated charging and commitment of incompetent defendants. We disagree.

**¶43** Under *Rider*, existing procedural safeguards deter unjustified prosecution of incompetent defendants. First, the State does not have unfettered discretion to refile charges against an NCNR defendant. *See Rider*, 233 Ariz. at 317 ¶ 11. Indeed, the State must have reasonable grounds that the defendant may have regained competency before refiling charges. *Id.* The State's compliance with *Rider* is subject to subsequent judicial review. *See id.* This requirement exists because, post-charge, the State must rebut the presumption of incompetency, a mandate rooted in defendants' due process rights. *See Adams v. Griffin*, 256 Ariz. 461, 467 ¶ 19 (App. 2023).

**¶44** Second, Arizona law expressly allows any party—or the court on its own motion—to request a competency examination any time (even immediately) after the State files charges. *See* A.R.S. § 13-4503(A). That motion triggers judicial review of the defendant's present mental state and enables the court to dismiss the charges if the defendant remains incompetent. *See id.*; *see also* § 13-4517(A)(3).

**¶45** Third, several institutional standards and norms disincentivize prosecutorial abuse under *Rider*. For example, prosecutors who repeatedly charge an NCNR defendant without legal justification risk case dismissal with prejudice and potential bar disciplinary proceedings. *See* Ariz. R. Sup. Ct. 42, Ethical Rule ("ER") 8.4(d) (prohibiting "conduct that is prejudicial to the administration of justice"); ER 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a good faith basis in law and fact for doing so that is not frivolous."); *see also In re Sponsel*, No. SB-24-0007-AP, 2025 WL 1477523, at *14–15 ¶¶ 90–91 (Ariz. May 22, 2025) (discussing the Maricopa County Attorney's Office's policy, which requires a "reasonable likelihood of conviction" to charge a defendant); *see also Pool v. Superior Ct.*, 139 Ariz. 98, 103 (1984) ("It is the prosecutor's duty to refrain from improper methods calculated to produce a wrongful conviction just as it is his duty to use all proper methods to bring about a just conviction."). Defendants also may seek recourse through state or federal civil avenues. *See, e.g., Lacey v.*

*Maricopa County*, 693 F.3d 896, 919 (9th Cir. 2012) (setting forth elements of a 42 U.S.C. § 1983 malicious prosecution claim); *see also Overson v. Lynch*, 83 Ariz. 158, 161 (1957) (explaining the elements of the state tort of malicious prosecution). Moreover, as elected officials, county attorneys and the attorney general remain accountable to voters for unethical prosecutions. Carson's arguments fail under *Medina*.

**¶46** In sum, we reject *Johnson*'s judicial preapproval requirement for refiling charges against NCNR defendants. Instead, we adopt the *Rider* standard because it preserves prosecutorial discretion while safeguarding the due process rights of incompetent defendants.

## II.

**¶47** We next consider the *Carson II* decision. Relying on *Johnson*, the court of appeals in *Carson II* vacated the trial court's order authorizing the State to refile charges. 258 Ariz. at 94 ¶ 17. The court reasoned that the State's evidence (Carson's compliance with treatment and discharge from Valleywise) did not support a reasonable belief that Carson may have regained competency. *Id.* at 93 ¶¶ 13, 16. Therefore, the *Carson II* court rejected the State's attempt to refile charges. *Id.* at 91 ¶ 2, 93 ¶ 17. The *Carson II* court erred for several reasons.

## A.

**¶48** First, *Carson II* erred by accepting *Johnson*'s premise that due process requires judicial approval before the State may refile charges following a finding of incompetency. *See id.* at 92–93 ¶ 12. But as explained in paragraph 33, we reject *Johnson*'s preapproval requirement. Rather than revisiting the validity of *Johnson*, the *Carson II* panel accepted it as controlling and considered whether the State's post-discharge evidence was sufficient to rebut the presumption of incompetency. *See id.* at 93 ¶ 13.

**¶49** Second, the *Carson II* court erred by adopting *Johnson*'s corruption of the *Rider* standard which, as explained in paragraph 25, conflated the standards for refiling and rebutting the presumption of incompetency. *See id.* ¶ 16 ("Carson's compliance with a treatment order and his release from a civil commitment evaluation facility are *not enough to overcome the presumption of incompetency . . . .*" (emphasis added)). Under *Rider*, the State need not rebut the presumption to refile—it need only

present a reasonable belief that the defendant "*may* have regained competency." *See Rider*, 233 Ariz. at 317 ¶ 11 (emphasis added).

**¶50**      The presumption protects incompetent defendants from prosecution. *See State v. Lewis*, 236 Ariz. 336, 340–41 ¶¶ 10, 14 (App. 2014). But it does not bar the State from refiling charges based on a reasonable belief that new information suggests a defendant's competency *may* have been restored. *Carson II* erred by holding that the State's showing—Carson's discharge from inpatient care and treatment compliance—was insufficient because it failed to rebut the presumption. That standard is qualitatively different from and exceeds *Rider*'s requirements.

**¶51**      Third, *Carson II* erred by relying on *Oligschlaeger v. Mulleneaux*, an unpublished case, to rebut the self-evident proposition that discharge from treatment may signal improved functioning, medication compliance, or diminished danger—all indicators that a defendant *may* have regained competency. *See* 258 Ariz. at 93 ¶ 14 (citing *Oligschlaeger*, 1 CA-SA 19-0083, 2019 WL 2185161, at *4 ¶ 17 (Ariz. App. May 21, 2019) (mem. decision)); *see also Rider*, 233 Ariz. at 317 ¶ 11 (finding that a state hospital's plan to discharge the defendant for outpatient care, among other factors, suggested that the defendant may have regained competency). *Oligschlaeger* cited no authority for the proposition that discharge from treatment of a person recently charged with a violent offense and deemed NCNR does not support a "reasonable belief" that the person's competency *may* have been restored. *See* 2019 WL 2185161, at *4 ¶¶ 16–18. This is an extraordinary proposition particularly where, as here, Carson was released despite the charges for a violent offense that, if proven, demonstrate a grave risk to the community.

**¶52**      Carson, citing *Rider*, acknowledges that discharge may serve as evidence of restoration. He merely claims that his case differs factually. But *Rider* sets a flexible, low threshold—not a rigid, fact-matching test—because competency is fluid and person specific. The State met its burden by presenting evidence after recharging Carson that reasonably suggested his competency may have been restored. That is all *Rider* and due process require.

**B.**

**¶53**        We vacate *Carson II*, overrule paragraphs 22–27 of *Johnson*, and affirm *Rider* as the controlling standard. When the State seeks to refile charges following an NCNR finding, it need not obtain judicial preapproval. Rather, the State must possess a reasonable belief that the defendant's competency status may have changed based on post-dismissal events. *See Rider*, 233 Ariz. at 317 ¶ 11. Once the State has refiled the charges, it should inform the court and defense of the prior NCNR finding and explain its basis for believing the defendant's condition may have changed. The defendant may challenge whether the State met the *Rider* threshold. If the court finds that the State satisfied the *Rider* standard, the State has two procedural options: it may attempt to rebut the presumption of incompetency and proceed with prosecution, or it may pursue a dangerousness determination under § 13-4517(A)(4) without first attempting rebuttal. The *Rider* standard governs the threshold for refiling, not the State's ultimate position on current competency. So long as the presumption of incompetency remains unrebutted and charges are pending, the court may proceed with a dangerousness trial. Under § 13-4503(A) and Rule 11.6(a)(4), any party or the court may request a competency examination.

**III.**

**¶54**        Our disposition returns the parties to the 2022 Case. We now address the reasons underlying our remand to the trial court permitting the State to petition for a dangerousness trial under § 13-4517(A)(4). *See supra* ¶ 18.

**A.**

**¶55**        We conclude that a court must have an active criminal case pending to trigger the court's authority to grant a dangerousness trial under § 13-4517(A)(4).

**¶56**        Statutory interpretation begins with the text. *State v. Serrato*, 568 P.3d 756, 759 ¶ 9 (Ariz. 2025). If a statute's text is clear and unambiguous, it controls unless it results in an absurdity or a constitutional violation. *4QTKIDZ, LLC v. HNT Holdings, LLC*, 253 Ariz. 382, 385 ¶ 5 (2022). Section 13-4517(A) outlines four procedural paths that may follow

an NCNR determination. One of those options, § 13-4517(A)(4), applies if "the defendant is charged with a serious offense as defined in [A.R.S.] § 13-706" and allows a court to "order a trial to determine if the defendant is dangerous and should be involuntarily committed pursuant to [A.R.S.] § 13-4521."

¶57 The State notes that § 13-4517(A)(4) does not expressly require a pending prosecution or active case. But the State concedes that § 13-4517(A)(4)'s use of the present tense—"is charged with a serious offense"—suggests that the legislature intended a dangerousness trial to be tethered to an active prosecution. Arizona law presumes that statutes use verb tenses deliberately. A.R.S. § 1-214(A) ("Words in the present tense include the future as well as the present."). Thus, when a court dismisses charges, a defendant no longer "is charged" within the meaning of § 13-4517(A)(4), and the court lacks authority to order a dangerousness trial under that provision.

¶58 We agree with Carson that this reading aligns with the broader statutory framework. Dangerousness trials are not free-floating proceedings; they are embedded within the criminal case process. Related provisions confirm this interpretation. For example, § 13-4521(A) directs courts to consider dismissal under § 13-4517(A)(3) if no probable cause supports the charges. And § 13-4521(F) mandates dismissal even after a dangerousness finding. These provisions assume an active case and would make little sense if the court could proceed without one. *See Nicaise v. Sundaram*, 245 Ariz. 566, 568 ¶ 11 (2019) ("We interpret statutory language in view of the entire text, considering the context and related statutes on the same subject.").

¶59 The State argues that § 13-4517(C) and Rule 11.5(b)(4), which allow courts to "retain jurisdiction over the defendant" until a court arranges treatment or guardianship, indicate authority to proceed even after dismissal. But those provisions preserve jurisdiction over the person, not over the prosecution. Retaining jurisdiction to monitor treatment and guardianship does not authorize initiating a new phase of litigation once a court dismisses the underlying charges.

¶60 Due process buttresses this interpretation. Interpreting § 13-4517(A)(4) to permit dangerousness trials without pending charges would facilitate indefinite detention, which would raise serious

constitutional concerns. *See Jackson*, 406 U.S. at 738; *see also Rider*, 233 Ariz. at 317 ¶ 10 ("[T]he state may not continually refile charges for the purpose of holding a defendant based only on his chronic incompetence to stand trial."). We interpret statutory language to avoid constitutional conflict. *Greyhound Parks of Ariz., Inc. v. Waitman*, 105 Ariz. 374, 377 (1970) (noting that "a construction should be adopted which avoids constitutional doubts"); *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 247–51 (2012).

**¶61**      Accordingly, if the State elects to pursue a dangerousness trial under § 13-4517(A)(4), it must do so while charges remain pending. Once the charges are dismissed, a dangerousness trial is no longer an option.

**B.**

**¶62**      The State's ability to proceed under § 13-4517(A)(4) also depends on whether it can rely on the June 2022 NCNR finding from the 2018 Case in the 2022 Case. We hold that the State may rely on the 2022 NCNR finding to support a petition for a dangerousness trial provided the petition relates to the same charges as the 2018 Case.

**¶63**      This issue arises because § 13-4517(A)(4) allows a dangerousness petition only if the court "finds" that a defendant is "incompetent to stand trial" and not restorable. "Incompetent to stand trial means that as a result of a mental illness, defect or disability a defendant is unable to understand the nature and object of the *proceeding* or to assist in the defendant's *defense*." § 13-4501(3) (emphasis added); *see also* Ariz. R. Crim. P. 11.1(2) (defining "incompetence" similarly).

**¶64**      Here, only one court has deemed Carson NCNR: the trial court in the 2018 Case, which made that finding in June 2022. No court has issued a subsequent NCNR ruling. Carson argues that the present-tense term "finds" in § 13-4517(A) requires a fresh NCNR determination in every case. But that argument overlooks the presumption of continued incompetency. *See Lewis*, 236 Ariz. at 341 ¶ 10 (noting that the "initial determination of incompetence raises a rebuttable presumption of continued incompetence"). We have recognized that presumption since 1967. *See Bradley*, 102 Ariz. at 487; *State v. Blazak*, 110 Ariz. 202, 204 (1973) ("The prior adjudication of mental incompetency gives rise to a rebuttable presumption of continued incompetency." (quoting *Bradley*, 102 Ariz.

19

at 487)); *see State v. Hehman*, 110 Ariz. 459, 460 (1974). Thus, the presumption of incompetence remains in effect until affirmatively rebutted.

**¶65** Carson's 2022 NCNR determination remains unrebutted. Carson argues that the State refiled the charges because the trial court found that post-dismissal events suggested regained competency. He contends that if that ruling stands, the presumption has been rebutted and the case must proceed to trial—not a dangerousness proceeding. We disagree.

**¶66** First, that argument is now irrelevant because we overrule paragraphs 22–27 of *Johnson*, nullifying *Johnson*'s refile procedure. *See supra* ¶¶ 2, 18, 33, 53. Moreover, Carson conflates the standard for refiling under *Rider* with rebutting the incompetency presumption. Again, the State need only rebut the presumption after refiling the charges to continue the prosecution, not as a prerequisite to refile. *See supra* ¶ 52.

**¶67** In addition to the presumption of incompetency, § 13-4501(3)'s language supports the conclusion that the State may rely on the 2022 NCNR finding. *See Serrato*, 568 P.3d at 761 ¶ 19 (explaining that courts read statutes in context by considering the broader relevant statutory scheme). Section 13-4501(3)'s plain language suggests that an NCNR determination is charge-specific. Indeed, § 13-4501(3) defines incompetency with reference to "*the proceeding*" and "*the defendant's defense*"—both of which are tied to particular charges. (Emphasis added.) *See also* Rule 11.1(a)(2) (defining "incompetence" as when a defendant is unable "to assist in his or her *defense* because of a mental illness, defect, or disability" (emphasis added)). Consequently, once a court deems a defendant NCNR for a specific charge, the State cannot refile on that charge unless it satisfies the *Rider* standard. But the presumption does not extend to new charges arising from new offenses.

**¶68** Here, the 2022 charges arise from the same underlying incident as the 2018 Case, but they include one additional offense: misconduct involving weapons. Because we adopt a charge-specific approach, the State may rely on the 2022 NCNR ruling to support a dangerousness petition tied to the same conduct. However, if the State elects to include the newly added weapons charge in the petition, it must first obtain a Rule 11 determination as to that offense.

## C.

¶69         In July 2021, the trial court found Carson incompetent to stand trial in the 2018 Case.  In June 2022, the court found that there was no substantial probability that he would regain competency within twenty-one months.  The issue is whether—more than three years later—the State may rely on that 2022 NCNR determination to support a future dangerousness petition under § 13-4517(A)(4).  We conclude that it may.

¶70         Section 13-4517(A) provides that if a court finds a defendant incompetent to stand trial and further concludes that there is "no substantial probability that the defendant will regain competency *within twenty-one months after the date of the original finding of incompetency*," the court must proceed to one of four listed dispositions, including a dangerousness trial.  (Emphasis added.)  Both parties agree that the twenty-one month period only limits restoration efforts.  That timeline triggers, rather than ends, the need for one of the four options under § 13-4517(A)(1)–(4).  Nothing in § 13-4517(A) suggests that a dangerousness trial must occur within the twenty-one month timeframe.

¶71         Interpreting § 13-4517(A) as imposing a strict cutoff for all action—rather than just restoration—would fracture the statute's internal logic.  That interpretation would, for example, bar a court from dismissing a case after the twenty-one month deadline, even though dismissal is one of the authorized options.  *See* § 13-4517(A)(3).  And "[o]ne of the more important [statutory construction] rules is that effect shall, if possible, be given to every part of a statute."  *Town of Florence v. Webb*, 40 Ariz. 60, 64 (1932); *see also* Scalia & Garner, *supra* ¶ 60, at 167 (noting that a statute should be read "to consider the entire text, in view of its structure and of the physical and logical relation of its many parts").  The more reasonable reading is that § 13-4517(A) requires the court to *act*—not to act *within* twenty-one months.  The time expires on restoration, not on disposition.

¶72         The court of appeals adopted this interpretation in *Nowell v. Rees*, 219 Ariz. 399 (App. 2008).  There, the court found the defendant incompetent to stand trial but continued to order restoration treatment over several years based on conflicting expert reports.  *Id.* at 401–02 ¶¶ 2–5.  Nowell filed a special action, arguing that Arizona law limits restoration efforts to the twenty-one months after the court's first incompetency finding.  *Id.* at 404 ¶ 12.  The court agreed, holding that once a court finds

no substantial probability of restoration within the twenty-one month period, it must cease restoration efforts and select one of the statutory outcomes. *Id.* at 405 ¶ 16, 407 ¶ 27.

¶73 Although *Nowell* did not address dangerousness trials—because the legislature had not yet enacted subsection (A)(4)—its reasoning applies here. The court emphasized that the statute creates a linear structure: incompetency, attempted restoration, and then disposition. *See id.* at 407 ¶ 25. It noted—but did not resolve—the procedural ambiguity that arises when charges are refiled without a renewed Rule 11 finding. *See id.* We resolve that ambiguity today. The twenty-one month period's expiration forecloses additional restoration efforts, not the court's ability to take further action.

**D.**

¶74 We now address § 13-4517(A)(4)'s retroactivity. The trial court deemed Carson NCNR in June 2022—well before the statute's January 1, 2024, operative date. We must decide whether the State may file a dangerousness petition based on an NCNR determination that predates the statute's effective date. We hold that the statute may be applied retroactively.

¶75 Arizona courts presume that statutes have a prospective, not retroactive effect. *Krol v. Indus. Comm'n of Ariz.*, 565 P.3d 1013, 1019 ¶ 22 (Ariz. 2025). Ordinarily, "[n]o statute is retroactive unless expressly declared therein." A.R.S. § 1-244. But "the prohibition on retroactive application of statutes is not absolute." *In re Shane B.*, 198 Ariz. 85, 87 ¶ 8 (2000). In Arizona, "[e]nactments that are procedural only, and do not alter or affect earlier established substantive rights may be applied retroactively" because "litigants have no vested right in a given mode of procedure." *Aranda v. Indus. Comm'n of Ariz.*, 198 Ariz. 467, 470 ¶ 11 (2000), *as corrected on denial of reconsideration* (Nov. 1, 2000).

¶76 The legislature did not expressly provide for § 13-4517(A)(4)'s retroactive application. *See Krol*, 565 P.3d at 1020 ¶ 25 ("[W]hen the legislature expressly declares that a statute is retroactive, the presumption against retroactivity does not apply."). Further, § 13-4517 evinces no "language that shows a legislative purpose" to accomplish retroactivity. *See id.* ¶ 27 (quoting *Schuster v. Schuster*, 42 Ariz. 190, 199 (1933)). But that

does not end the inquiry. Instead, the question is whether § 13-4517(A)(4) is procedural, and can be applied retroactively, or whether it is substantive, and cannot.

¶77        "A precise distinction between substantive and procedural rights or interests has proven elusive." *Shane B.*, 198 Ariz. at 88 ¶ 9. But "it is generally agreed that a substantive law creates, defines, and regulates rights while a procedural one prescribes the method of enforcing such rights or obtaining redress." *Allen v. Fisher*, 118 Ariz. 95, 96 (App. 1977); *see also Aranda*, 198 Ariz. at 470 ¶ 12 ("In general, procedural law relates to the manner and means by which a right to recover is enforced or provides no more than the method by which to proceed.").

¶78        Here, we apply the criminal context framework because § 13-4517(A)(4) applies only to criminal defendants charged with serious offenses who have been adjudicated NCNR. It arises from the criminal justice process and the underlying charges remain criminal. "In the criminal context, substantive law either defines a crime or involves the length or type of punishment." *Shane B.*, 198 Ariz. at 88 ¶ 9 (citation modified). It is undisputed that § 13-4517(A)(4) does not define a crime. Therefore, the critical question is whether § 13-4517(A)(4) affects a "punishment" on defendants. It does not.

¶79        The Ex Post Facto Clauses of the U.S. and Arizona Constitutions prohibit laws that increase the punishment for a crime after the offense was committed. *See* U.S. Const. art. I, § 9, cl. 3; Ariz. Const. art. 2, § 25. Accordingly, the Ex Post Facto Clauses pertain only to penal statutes. *See* U.S. Const. art. I, § 9, cl. 3; Ariz. Const. art. 2, § 25; *see Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 504 (1995). Thus, in determining whether a statute violates the Ex Post Facto Clauses, courts consider several factors to assess whether the statute is civil in nature and therefore outside the scope of the clauses. *See, e.g.*, *State v. Trujillo*, 248 Ariz. 473, 479 ¶ 34 (2020). All five factors analyze whether a statute aims at inflicting punishment: whether the statute (1) has been historically regarded as punishment, (2) imposes an affirmative restraint or disability, (3) promotes the traditional goals of punishment, (4) has a "rational connection to a nonpunitive purpose," and (5) is excessive with respect to a nonpunitive purpose. *See id.* (quoting *Smith v. Doe*, 538 U.S. 84, 97 (2003)). Under this framework, statutes affecting or prescribing civil commitment are not punitive.

¶80          Involuntary commitment does not constitute "punishment" where the statute's purpose is treatment and public protection, not retribution or deterrence. *See Martin v. Reinstein*, 195 Ariz. 293, 304 ¶¶ 23, 25 (App. 1999). In *Martin*, the court of appeals addressed whether the Sexually Violent Persons Act ("SVPA")—a statutory scheme that allows for involuntary civil commitment—was punitive and thus constituted punishment. *See id.* at 303–04 ¶¶ 21–23. The court held that the SVPA was regulatory in nature because the legislature designed it to provide treatment and protect the public, rather than to punish individuals for past crimes. *Id.* at 304 ¶ 23. It emphasized that "commitment for treatment has been considered a civil solution to the difficult problems surrounding mental health treatment," and that such commitments do not equate to criminal punishment. *See id.* ¶ 25. The court also observed that detention, by itself, does not render a statutory scheme punitive, particularly where those confined are subject to conditions like other civil commitments. *See id.* ¶ 23.

¶81          *Kansas v. Hendricks*, 521 U.S. 346, 368–69 (1997), reinforces the conclusion that involuntary commitment does not constitute punishment. In *Hendricks*, the U.S. Supreme Court deemed a civil commitment scheme for sexual offenders non-punitive despite the potential for an indefinite period of restraint. *Id.* at 363–64.[2] The Court stated that "[a]lthough the civil commitment scheme at issue here does involve an affirmative restraint, the mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment." *Id.* at 363 (citation modified). Rather, "[t]he [s]tate may take measures to restrict the freedom of the dangerously mentally ill" because this promotes "a legitimate nonpunitive governmental objective." *Id.* The Court further noted that "[i]f detention for the purpose of protecting the community from harm *necessarily* constituted punishment, then all involuntary civil commitments would have to be considered punishment. But we have never so held." *Id.* (emphasis in original).

---

[2] The Kansas civil commitment scheme in *Hendricks* resembles Arizona's civil commitment scheme that *Martin* upheld. *Martin*, 195 Ariz. at 301 ¶ 15 (noting that "the United States Supreme Court recently upheld the Kansas SVP Act—an act much like Arizona's").

**¶82** This reasoning applies with equal force to § 13-4517(A)(4). Carson argues that applying § 13-4517(A)(4) retroactively would violate the Ex Post Facto Clauses because it is "intended to be penal." As evidence, Carson points to the fact that the basis for commitment under § 13-4521 "is defined in the criminal code." But statutory placement in the criminal code is not dispositive. *See Trujillo*, 248 Ariz. at 479 ¶ 30 (concluding that, "despite placement of the registration statutes in the criminal code, the legislature intended to create a civil regulatory scheme").

**¶83** To further support his argument that dangerousness trials are punitive, at oral argument, Carson pointed to the legislature's decision to tie the civil commitment period to the presumptive sentencing term for the underlying offense. *See* § 13-4521(H) ("A commitment order issued pursuant to this section may not be in effect for more than the presumptive sentence the defendant could have received for the highest charged offense . . . ."). But, as the State argues, the involuntary commitment resulting from a § 13-4517(A)(4) dangerousness trial is not retributive because the basis for commitment depends on the current mental condition of the individual, not a past crime. Specifically, Carson's involuntary commitment under the statute would end if the court subsequently deemed him competent to stand trial or "no longer dangerous." *See* § 13-4521(D)–(G). Rather than mandating a period of detention tied to the sentencing term, the statute eliminates indefinite restraint by conditioning confinement on incompetency and dangerousness and capping its duration. Moreover, § 13-4521(F) reinforces the statute's non-punitive design. It directs that any commitment occur in a secure mental health facility for the purpose of providing the defendant with "education, care, supervision and treatment," rather than imposing punishment. § 13-4521(F).

**¶84** Even if § 13-4517(A)(4) were punitive, it only authorizes the option for a party to request a dangerousness trial. It does not guarantee that a dangerousness trial will occur or result in commitment under § 13-4521(F). As in *Shane B.*, the statute imposes no immediate consequence and does not deprive a defendant of a current liberty interest. *See* 198 Ariz. at 89 ¶ 15. There, this Court upheld retroactive application of a statute that designated the petitioner as a "first time felony juvenile offender," in part because the designation caused no present loss of "any enumerated right or privilege." *Id.* The designation only established that certain procedural consequences would follow if the juvenile reoffended. *Id.*

Section 13-4517(A)(4) functions similarly. It does not itself impose commitment or any other restraint on liberty. *See* § 13-4517(A)(4). Instead, it allows the State to request a dangerousness trial, and whether commitment follows depends on whether the dangerousness trial occurs and the factfinder's determination. *See* § 13-4521(E)–(F).

**¶85** This contrasts with *Saucedo v. Superior Court*, 190 Ariz. 226, 228–29 (App. 1997), where the court of appeals invalidated the retroactive application of a statute that automatically transferred certain juvenile defendants to adult court based on their age and offense type. There, the court deemed the statute punitive because it imposed an immediate change in legal status and subjected the juvenile to adult criminal penalties for the same underlying conduct. *See id.* Section 13-4517(A)(4), however, does not change the legal character of the underlying charges or increase the punishment associated with them. It preserves the criminal nature of the charges but allows for a separate civil process that may result in treatment-based commitment—only after a factfinder determines the defendant meets the statutory criteria. *See* §§ 13-4517(A)(4), -4521(E)–(F). And if the factfinder makes that determination, the court must dismiss the charges. *See* § 13-4521(F).

**¶86** In sum, § 13-4517(A)(4) centers on a defendant's current mental condition, not a past offense. It does not alter the elements of a crime, extend the punishment, or trigger any immediate consequence to a defendant's constitutional rights. Instead, dangerousness trials merely provide a "method by which to proceed" once a court deems a defendant NCNR. *See Krol*, 565 P.3d at 1023 ¶ 40 (holding that a workers' compensation law was substantive and could not apply retroactively because it did not "merely relate to the manner and means by which a right to recover is enforced or provide the method by which to proceed" (citation modified)). In any event, even if a dangerousness trial leads to involuntary commitment, it is commensurate with the civil commitment schemes upheld in *Hendricks* and *Martin*.

## CONCLUSION

**¶87** We affirm the trial court's order denying Carson's motion to dismiss and motion for reconsideration, effectively authorizing the State to renew Carson's prosecution. We also vacate *Carson II* and reiterate our remand to the trial court in the 2022 Case for proceedings consistent with

this Opinion.  Further, we hold that § 13-4517(A)(4) applies only while charges remain pending, permits reliance on a prior NCNR finding so long as it relates to the same conduct, and may be applied retroactively.  Further, a delay between the NCNR finding and the petition does not preclude a dangerousness trial.  We express no opinion on the merits of either course available to the State—rebutting the presumption or pursuing a dangerousness trial—which remain within the purview of the trial court.